2012 VT 108

# In re D.C., Juvenile

[71 A.3d 1191]

No. 12-240

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed December 21, 2012

*Matthew F. Valerio*, Defender General, and *Rebecca Turner*, Appellate Defender, Montpelier, for Appellant-Mother.

*William H. Sorrell*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, and *Jody Racht* and *Martha E. Csala*, Assistant Attorneys General, Waterbury, for Appellee Department for Children and Families.

*Michael Rose*, St. Albans, for Appellee Juvenile.

¶ 1. **Dooley, J.** Mother appeals the decision of the superior court, family division, terminating her parental rights to her son, D.C. We affirm.

¶ 2. D.C. was born in May 2005. He spent the first two years of his life with both parents, who were not married. When his parents separated in 2007, the father took D.C. to .stay with him. Although a child-custody order granted mother parental rights and responsibilities, she allowed father to take the child because she had difficulty finding a residence and she knew that father had the support of his mother in caring for D.C. This arrangement lasted until the end of 2009, when mother obtained police assistance to assert her custodial rights over D.C.

¶ 3. Two weeks later, after mother had moved into a motel with D.C., the Department for Children and Families (DCF) filed a petition alleging that D.C. was a child in need of care or supervision (CHINS) due to a lack of proper parental care. The affidavit in support of the petition stated that: (1) five years earlier mother's parental rights had been terminated with respect to an older child because of unsafe and unsanitary living conditions and the child's exposure to the risk of being sexually abused; (2) mother had a relationship with a known, untreated sex offender who had been seen frequently with mother at her motel room; (3) the motel room was filthy and unsanitary; (4) D.C. was suffering from an untreated respiratory illness; and (5) school

officials had reported D.C. arriving at school hungry and not dressed properly for the cold.

¶ 4. At a temporary care hearing, the family court issued a conditional custody order giving the father temporary legal custody of D.C. The parents entered into a merits stipulation that D.C. was in need of care or supervision. A disposition case plan was prepared, and at the April 1, 2010 disposition hearing, the parents and D.C. agreed to, and the court approved, an initial disposition plan that continued conditional custody with the father. Although the court approved a case plan goal of returning custody to the father, it did not enter a written disposition order.

¶ 5. In September 2010, DCF moved to amend the disposition plan on the grounds that the father had been arrested for aggravated assault and robbery, and had left D.C. in the custody of a person whose own children had been the subject of termination proceedings. At an October 2010 hearing on the motion, both parents agreed to conditional custody of D.C. with the father's mother.

¶ 6. At a periodic review hearing in September 2011, D.C.'s paternal grandmother indicated that she was interested in adopting D.C. Unfortunately, the grandmother died two months later, and D.C. was placed in DCF custody. Since January 2012, D.C. has been in the foster home of a woman who had been employed for the previous thirteen years in the public school system as a paraeducator for special needs children.

¶ 7. DCF's February 2012 permanency plan for D.C. recommended termination of parental rights (TPR), and in April 2012, DCF filed a termination petition. The hearing on DCF's petition was held on June 28, 2012. At the beginning of the hearing, the father relinquished his parental rights. The family court noted that DCF's initial disposition case plan had not set forth a goal of reunification with mother and had not identified any expectations or services for mother. Rather, the plan merely noted that mother would have the opportunity to visit with D.C. and expressed the hope that she would begin to make better choices and be able to become more involved in D.C.'s life.

¶ 8. Although the State indicated that it was asking for termination as a modification of the disposition order, the court expressed uncertainty about how to analyze the question of whether there had been stagnation when DCF had never made mother the subject of any reunification efforts. D.C.'s counsel

agreed that the procedural posture of the case was more akin to seeking termination of parental rights at initial disposition rather than modifying an earlier order. Opining that an initial-disposition analysis would place the highest burden on the State, the court asked mother's counsel for his opinion. He responded: "We agree."

¶ 9. On July 12, 2012, the family court issued its decision terminating mother's parental rights. The court noted that the parties had agreed at the termination hearing that the appropriate procedural posture was to treat the case as a TPR petition at the initial disposition stage, given that the initial disposition plan had called for reunification only with the father, who had voluntarily relinquished his parental rights. The court then skipped over the threshold question of whether changed circumstances existed and instead went straight to considering the best interests of the child.

¶ 10. Examining the statutory best-interests criteria, the court concluded that: (1) mother did not have a good relationship with D.C.; (2) D.C. had adjusted well to his foster home; (3) D.C. had special needs and was at a critical point in his life from a developmental standpoint; (4) although mother had been consistent with her visits, she had not played a constructive role in D.C.'s life and was unable to provide the necessary care to address D.C.'s special needs; (5) mother had not worked toward putting herself in a position to care for D.C. and was no closer to being able to parent him than she had been more than two years earlier when he was removed from her custody; (6) mother failed to comprehend the nature and extent of D.C.'s special needs; and (7) mother would not be able to resume her parental duties within a reasonable period of time. Accordingly, the court entered an order terminating mother's parental rights.

¶ 11. On appeal, mother argues that the termination order is invalid because the court failed to: (1) consider whether the State had met its burden of showing changed circumstances, which was required because the State's termination petition sought modification of the initial disposition order; (2) determine by clear and convincing evidence that mother was presently unfit to care for D.C.; and (3) find that DCF had made reasonable efforts to prevent the unnecessary removal of D.C. from his home.

I.

¶ 12. In her first argument, mother asserts that the family court exceeded its authority at the termination hearing by effectively

repositioning the case back to before the initial disposition more than two years earlier. According to mother, in so doing, the court established an unlawful standard that absolved the State from meeting its statutory obligation to show changed circumstances. In support of this argument, mother points to three cases in which this Court invalidated conditioned or continued disposition orders that had led to later termination orders entered without the State having to show changed circumstances. See *In re B.B.*, 159 Vt. 584, 587-89, 621 A.2d 1270, 1272-73 (1993) (holding that court's order reserving decision on termination petition at initial disposition and keeping record open for evidence of future progress must be treated as de facto denial of petition); *In re R.B.*, 152 Vt. 415, 422-23, 566 A.2d 1310, 1313-14 (1989) (invalidating provision in family court's disposition order that allowed parties to reopen order for any reason at any time after thirty days with right to full disposition hearing as if first hearing and order had never existed); *In re A.A.*, 134 Vt. 41, 43, 349 A.2d 230, 232 (1975) (reversing termination decision that stemmed from automatic review provision in initial disposition order). Mother acknowledges that she did not object to the procedural analysis by the family court in this case, but notes that we reversed the orders in the above cases even though the parties had not objected at trial to the procedural posture adopted by the trial court in those orders. See *In re B.B.*, 159 Vt. at 589, 621 A.2d at 1273 (rejecting State's argument that mother waived her right to appeal by failing to object and noting that no objections were made in *In re A.A.* or *In re R.B.*).

¶ 13. Here, in contrast to the above cases, mother did more than merely fail to object to the procedural framework adopted by the family court. Rather, as she acknowledged at oral argument, she stipulated to the procedure she now challenges for the first time on appeal. Based on the discussion that took place among the court and the parties at the beginning of the termination hearing, she made a tactical decision through counsel to proceed as if this were a TPR petition at initial disposition. She explicitly agreed that it was the right way to proceed. Under these circumstances, we conclude that she waived her right to challenge that procedure on appeal. See *Anderson v. Coop. Ins. Cos.*, 2006 VT 1, ¶ 10, 179 Vt. 288, 895 A.2d 155 ("A waiver is a voluntary relinquishment of a known right, and can be express or implied." (citation omitted)); cf. *In re A.O.*, 161 Vt. 302, 308, 640

A.2d 537, 540-41 (1994) (holding that father's stipulations agreeing to state custody and disposition plan precluded finding of error based on lack of written findings to support disposition order); *In re P.F.*, 133 Vt. 64, 66, 329 A.2d 632, 634 (1974) (holding that parties' stipulation to finding of neglect obviated the need for detailed findings indicating circumstances upon which finding of neglect was based).

¶ 14. We reject mother's suggestion that she could not waive the court's handling of this matter as a TPR petition at initial disposition because the court lacked subject matter jurisdiction to do so. Without question, the family court possessed subject matter jurisdiction over the general type of controversy before it in this case. See 33 V.S.A. § 5103(a) (stating that family court has "exclusive jurisdiction over all proceedings concerning a child who is or who is alleged to be . . . in need of care or supervision brought under the authority of the juvenile judicial proceedings chapters, except as otherwise provided in such chapters"). Moreover, the juvenile proceedings act expressly authorizes the family court to order termination of parental rights at the initial disposition stage, see *id.* § 5318(a)(5) (providing that at initial disposition court may order termination of parental rights and transfer of custody to DCF), as well as through modification of the initial disposition order, see *id.* § 5113(b) (providing that court may modify previous order on grounds that change of circumstances requires such action to serve child's best interests).

■ ¶ 15. The fact that the court may have erred in how it exercised its jurisdiction neither voids the court's judgment nor precludes the parties from accepting the judgment or waiving the right to later challenge that judgment. Cf. *In re B.C.*, 169 Vt. 1, 7, 726 A.2d 45, 50 (1999) ("[W]hen a court has jurisdiction over a general category of case, the fact that the court errs in exercising its jurisdiction in a particular case within that general category 'is generally not sufficient to make the resulting judgment void for lack of subject-matter jurisdiction.'") (quoting 12 J. Moore et al., Moore's Federal Practice § 60.44[2][b], at 60-142 (3d ed. 1998)). This is particularly true here given the parties' acquiescence in the arrangement. Otherwise, parties could agree to a particular procedural posture "while reserving the 'jurisdictional card' in the event of an unfavorable decision." See *In re B.C.*, 169 Vt. at 8, 726 A.2d at 50. In short, there is no jurisdictional defect in this case

precluding the parties from agreeing to waive the procedural posture adopted by the family court.

¶ 16. In any event, assuming that the family court was required to find a change of circumstances, any error on the court's part in not doing so was harmless because changed circumstances were manifest in this case. See *In re R.W.*, 2011 VT 124, ¶ 17, 191 Vt. 108, 39 A.3d 682 (noting that harmless error standard has been employed in termination cases and that court error warrants reversal only if substantial right of party is affected). Accordingly, we conclude that the father's relinquishment of his parental rights and the grandmother's death established changed circumstances by clear and convincing evidence.

¶ 17. From the outset, no one involved in this case, including mother, anticipated that she would assume primary care of D.C. As noted, the disposition plan anticipated that mother would be able to have only supported visits with D.C. Mother never expressed an interest in caring for· D.C.; to the contrary, she stipulated to orders giving custody first to the father and then to the father's mother. Given that the disposition plan called for reunification only with the father, the father's voluntary relinquishment of his parental rights and the grandmother's subsequent death after she had assumed custody of the child established changed circumstances satisfying the threshold for the family court to consider D.C.'s best interests.

¶ 18. Mother's argument that a finding of stagnation cannot be based solely on the acts of third persons misses the point. Section 5113(b) allows the court to modify previous orders "on the grounds that a change in circumstances requires such action to serve the best interests of the child." Thus, the threshold statutory requirement is found in the broader term "change of circumstances" rather than the more specific term "stagnation." Parental stagnation is but one way to show changed circumstances. See *In re Certain Neglected Children*, 134 Vt. 74, 77, 349 A.2d 228, 230 (1975) (rejecting mother's argument that changed circumstances could not be based on her failure to improve her parental skills and permitting cautious use of "stagnation in parental capacity to care for children as a ground for change of circumstances necessary to support a transfer of residual parental rights"). To be sure, the threshold changed-circumstances requirement is most often met by showing stagnation in a parent's ability to care for a child. *In re*

*J.G.*, 2010 VT 61, ¶ 10, 188 Vt. 562, 2 A.3d 817 (mem.) (stating that threshold showing of changed circumstances is " 'most often found when the parent's ability to care properly for the child has either stagnated or deteriorated' " (quoting *In re H.A.*, 153 Vt. 504, 515, 572 A.2d 884, 890 (1990))). But the statutory standard is changed circumstances, not stagnation, and stagnation is not the only way to show changed circumstances.

■ ¶ 19. In arguing that the threshold requirement cannot be satisfied through the actions of third parties, mother relies upon a case that stands only for our oft-stated principle that "stagnation caused by factors beyond the parents' control [cannot] support termination of parental rights." *In re S.R.*, 157 Vt. 417, 421-22, 599 A.2d 364, 367 (1991). Mother may be correct that *stagnation* cannot result solely from the actions of third parties, but that does not mean that other types of changed circumstances cannot arise independent of the subject parent's actions. In this case, the voluntary relinquishment of parental rights by the only parent who was the subject of reunification efforts, as well as the custodial grandmother's death, established changed circumstances that allowed the court to consider DCF's termination petition under the best-interests-of-the-child criteria.

## II.

¶ 20. Mother also argues that her right to procedural due process before the parent-child bond is severed precludes us from finding changed circumstances based solely on the circumstances of others, including D.C. This assertion ties in with mother's second major argument that the family court failed to determine by clear and convincing evidence that she was presently unfit to parent D.C. According to mother, at no point during the CHINS proceedings in this case has a court determined by clear and convincing evidence that she was unfit to parent, as required by the U.S. Supreme Court's holding in *Santosky v. Kramer*, 455 U.S. 745, 755 (1982). In mother's view, the evidence at the termination hearing showed only that she was very poor, not that she was an unfit parent.

■ ¶ 21. In *Santosky*, the U.S. Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the

State support its allegations by at least clear and convincing evidence." 455 U.S. at 747-48. The Court in *Santosky* reviewed and rejected a provision of a New York statute permitting irrevocable termination of parental rights based on a preponderance-of-the-evidence standard. Although the Court spoke in terms of proving parental "unfitness" in noting the specific state statutory criteria for determining whether a parent was capable of parenting a child, it did not purport to address the issue of what substantive showing was required to terminate parental rights. Indeed, the New York statutes, which allowed for termination of parental rights on a finding that the child had been permanently neglected, did not require that the court explicitly find that the parent was unfit. See *id.* at 748. Rather, *Santosky* addressed only the standard of proof for terminating parental rights required by procedural due process protections contained within the U.S. Constitution. See *In re Daniel C.*, 480 A.2d 766, 771 (Me. 1984) (noting that *Santosky* dealt only with standard by which elements in New York statute needed to be proved and citing majority of states applying "the *Santosky* requirement of clear and convincing evidence to whatever statutory elements the legislature has provided").

¶ 22. In other words, the *Santosky* holding stands for the proposition that whatever measure of "unfitness" a state requires to terminate parental rights must be shown by clear and convincing evidence. The Vermont Legislature has chosen the best-interests criteria contained in 33 V.S.A. § 5114(a), which encompass both directly and indirectly the question of parental fitness. Indeed, the most important criterion is the one that most directly addresses parental fitness — whether the parent is likely to be able to resume parental duties within a reasonable period of time. *Id.* § 5114(a)(3). Other criteria concern the parent's fitness indirectly by requiring the court to examine the parent's relationship with the child and what kind of role the parent has played and continues to play with respect to the child's welfare. *Id.* § 5114(a)(1), (2), (4). These criteria do not attempt to determine whether a parent is a "good" person or is generally fit to parent any child; rather, the critical question in a termination proceeding is whether the parent is fit, or will be fit within a reasonable period of time, to parent the particular child who is the subject of the termination proceeding.

¶ 23. Moreover, it is important to keep in mind that a TPR proceeding does not occur in a vacuum. Initially, there must be a determination following a merits hearing that the subject child is in need of care or supervision, see 33 V.S.A. § 5315(a), which directly addresses the parent's ability to care for the child at that time. See *In re C.A.*, 160 Vt. 503, 505, 630 A.2d 1292, 1294 (1993) (noting that absent finding of unfitness, court "may not remove a child from the parent's custody at the dispositional stage of a juvenile proceeding"); *In re J.H.*, 156 Vt. 66, 71, 587 A.2d 1009, 1012 (1991) ("The parental unfitness test must be met before [state] can initially be awarded custody of a child."). The State's burden to establish CHINS at the merits hearing is by a preponderance of the evidence, but the court, in its discretion, may find CHINS by clear-and-convincing evidence. *Id.* § 5315(a).

¶ 24. The parties can stipulate to CHINS or they may contest the issue, in which case they have the right to present evidence and to examine witnesses. *Id.* § 5315(b)-(c). Parents who stipulate to CHINS or state custody are essentially acknowledging their unfitness, at least temporarily, to parent their child. See *In re A.W.*, 164 Vt. 412, 417, 670 A.2d 1265, 1268 (1995) (noting that parties' stipulation at disposition hearing to state custody of children "precluded the parents from complaining that the court made no finding of parental unfitness").

¶ 25. Within thirty-five days of the CHINS finding there must be a disposition hearing, and, if the disposition is contested, all parties have a right to present evidence and examine witnesses. *Id.* § 5317(a)-(b). The standard of proof at the disposition hearing is preponderance of the evidence unless termination of parental rights is sought, in which case the standard of proof is clear and convincing evidence in light of the best-interest factors contained in § 5114(a). *Id.* § 5317(c)-(d). If termination is not sought at the initial disposition hearing but is sought later, the petitioner must show by clear and convincing evidence that changed circumstances exist and termination of parental rights serves the best interests of the child, 33 V.S.A. § 5113(b), as viewed through the specific criteria contained in § 5114(a).

¶ 26. This statutory framework is aimed at ensuring not only that children are protected from harm but also that the parent-child relationship is preserved unless circumstances, as demonstrated by clear and convincing evidence, require terminat-

ing that relationship because the parent is incapable of caring for his or her child. While this Court has noted on numerous occasions that breaking the parent-child custodial bond requires a finding of unfitness, see, e.g., *In re B.L.*, 145 Vt. 586, 591, 494 A.2d 145, 148 (1985), the term "unfitness" is not part of the legal lexicon in CHINS proceedings under Vermont law and is not treated as a legal term of art required by this Court or by *Santosky. In re C.A.*, 160 Vt. at 505, 630 A.2d at 1294 ("[T]he failure to use the word 'unfit' does not necessarily preclude a finding of unfitness in fact.").

¶ 27. Nor does *Santosky* stand for the proposition, as mother suggests, that the child's interests must be considered the same as those of the parent until the parent is found to be unfit and thus cannot be part of an unfitness determination. We agree that until a parent is proved to be unfit to care for a child, "the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Santosky*, 455 U.S. at 760. *Santosky* noted this truism in the context of stating that the foster parents' interests, no matter how substantial, were not directly implicated in the factfinding stage of New York's state-initiated permanent neglect proceeding against the natural parents. *Id.* at 761.

¶ 28. Vermont law is not inconsistent with this position. While Vermont's best-interests standards allow the court to consider a child's relationship with all persons having a significant role in the child's life, including any foster parents, see 33 V.S.A. § 5114(a)(1), we have stated on numerous occasions that the most critical factor is "the likelihood that the parent will be able to resume parental duties within a reasonable time," *In re B.M.*, 165 Vt. 194, 199, 679 A.2d 891, 894-95 (1996), and that "parental rights cannot be terminated simply because a child might be better off in another home," *In re E.C.*, 158 Vt. 8, 12, 603 A.2d 373, 376 (1992). But nothing in *Santosky* precludes a termination process that evaluates a parent's ability to care for a child by considering, in part, the subject child's circumstances, which very often are a result of the parent's earlier failure to properly care for the child.

¶ 29. In this case, mother has consistently acknowledged her inability to care for D.C. She stipulated to D.C. being CHINS, and she agreed to conditional custody of D.C. first with the father and then with the father's mother. Apart from a very brief period

in mid-January 2010, which ended with D.C.'s removal from her custody, mother has not cared for D.C. since 2007, when he was two years old. At the termination hearing, she acknowledged that she had no ability to parent D.C. at that time, several years after she last cared for the child for any extended period of time.

¶ 30. The trial court described in detail D.C.'s numerous special needs and mother's ongoing inability to care for him. Contrary to mother's assertions on appeal, the trial court did not terminate her parental rights because she was poor. Rather, the court terminated her parental rights because there was no likelihood that she would be able to resume her parental duties within a reasonable period of time. The court's unchallenged findings and conclusions reveal that mother has not been employed in fourteen years and, despite receiving supplemental security income, was not taking medications to address her mental-health issues. At the time of the termination hearing, she was on probation for a domestic assault conviction, subject to a curfew, and required to take anger-management classes. She had no idea where she would be living month to month. She acknowledged not knowing what D.C.'s needs were. She was aware of his developmental delays, but did not recognize their significance, and in fact believed that they were normal because she had had the same delays when she was young. According to the court, mother has never played a constructive role in D.C.'s life, has not taken any steps to be in a position to parent D.C., and consequently is no closer to being able to care for the child — particularly given his special needs — than she was two years earlier. In short, the evidence of mother's unfitness is overwhelming.

### III.

¶ 31. Finally, mother argues that the family court's termination order must be reversed because the State never undertook reasonable efforts to prevent the removal of D.C. from her care, as required by Vermont law. In making this argument, mother relies principally upon 33 V.S.A. § 5308(c)(1)(B), which states that if the family court transfers legal custody of a child, it must issue a written temporary care order that includes, among other things, "a finding as to whether reasonable efforts were made to prevent unnecessary removal of the child from the home."

¶ 32. We recently rejected a similar argument in *In re C.P.*, 2012 VT 100, ¶ 38, 193 Vt. 29, 71 A.3d 1142. In *In re C.P.* we noted

that reasonable-efforts determinations were incorporated into Vermont law to implement federal law, *id.* ¶ 32, presumably to preserve federal funding. As we explained with respect to the reasonable-efforts determination required by 33 V.S.A. § 5321(h)(1)-(2):

> Under the statute, this issue of reasonable efforts is separate from whether termination of parental rights is in a child's best interests. Termination of parental rights may be granted at the initial disposition stage if the court determines that it is in the best interests of the child, as set forth in the statutory factors. 33 V.S.A. § 5114. The extent of DCF's efforts to achieve the permanency plan is not one of the best-interests factors to be considered at termination. See *In re J.T.*, 166 Vt. [173], 180, 693 A.2d [283], 287 [(1997)] (explaining that extent of efforts to assist parents is not a best-interests factor). Thus, the court is not required to find DCF made reasonable efforts as a prerequisite to termination. *In re J.M.*, 170 Vt. 587, 589, 749 A.2d 17, 19 (2000) (mem.). In saying this, we recognize that the level of assistance provided to parents is relevant in determining whether "a parent is unlikely to be able to resume parental duties within a reasonable period" of time. *Id.*; *In re J.T.*, 166 Vt. at 180, 693 A.2d at 287. But our main point is that whether DCF made reasonable efforts to achieve permanency is a separate question from whether termination is in the child's best interests and the former is not a prerequisite to the latter.

*Id.* ¶ 38.

¶ 33. By the same token, whether DCF made reasonable efforts to prevent D.C.'s removal from his home is a separate question from, and not a prerequisite to, the issue of whether termination of parental rights is warranted under the statutory criteria contained in § 5114(a). In any event, mother stipulated to legal custody being transferred to the father and the grandmother, and at the time legal custody was transferred to DCF, D.C. was not living with mother.

¶ 34. Here, as in *C.P.*, nothing in the record supports a conclusion that termination resulted from factors beyond mother's

control. Indeed, by her own acknowledgement, mother did not consider herself a candidate for reunification from the beginning of DCF's involvement in the case. She was content to play a minimal role in D.C.'s life while DCF, with mother's agreement, focused on establishing permanency for D.C. first with the father and then the father's mother. The record supports the family court's undisputed findings that during the lengthy period when mother played a limited role in D.C.'s life and agreed to other family members assuming custody of the child, she made no progress in reaching a point where she could care for the child. Mother cannot now challenge the TPR order through a belated claim that DCF failed to make reasonable efforts to prevent D.C.'s removal from his home.

*Affirmed.*