*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2014-449

APRIL TERM, 2015

| | |
|---|---|
| In re M.S., Juvenile | } APPEALED FROM: |
| | } |
| | } Superior Court, Windham Unit, |
| | } Family Division |
| | } |
| | } DOCKET NO. 82-8-14 Wmjv |

Trial Judge: Katherine A. Hayes

In the above-entitled cause, the Clerk will enter:

Mother appeals from an adjudication by the family division of the superior court that her son, M.S., is a child in need of care or supervision (CHINS). We affirm.

Mother has two children, M.K, born in November 2008, and M.S., born in December 2012. In April 2014, the Department for Children and Families (DCF) filed CHINS petitions alleging that mother had abused M.K. and that M.S. was at risk of similar abuse. 33 V.S.A. § 5102(3)(A) (defining CHINS as meaning, among other things, child who has been abused or abandoned by parent, guardian or custodian). The allegations of abuse were based on mother's conduct captured by a video camera outside of her apartment. The video showed mother forcefully flinging M.K. to the ground and kicking her foot towards his face. On July 31, 2014, following a hearing, the family court adjudicated M.K. CHINS, but denied DCF's petition with respect to M.S., concluding that DCF had not demonstrated that M.S. was at risk of similar abuse. Mother appealed the family court's ruling as to M.K., and we affirmed the court's decision in January 2015. See In re M.K., 2015 VT 8, ___ Vt. ___.

Meanwhile, the day after the family court denied the first CHINS petition with respect to M.S., DCF filed a second CHINS petition alleging this time that M.S. was without proper parental care. See 33 V.S.A. § 5102(3)(B) (defining CHINS as meaning, among other things, child "without proper parental care or subsistence, education, medical, or other care necessary for his or her well-being"). In response to this second petition, the family court issued an emergency care order regarding M.S., who has remained with his brother in the same foster home since the boys were taken into DCF custody in April 2014. Following a contested merits hearing held over two days in November 2014, the family court issued a decision adjudicating M.S. as CHINS based on the following rationale:

> [M.S.] was identified very early as a child with special
> developmental needs, and, as stated above, the mother made

valiant efforts to get all the help she could to assist her in meeting them. However, despite those efforts, [M.S.] did not grow or learn as fast as he should have, and the court concludes that this was in part due to the mother's inability to provide him with care that he needed. This conclusion is based largely on the fact that [M.S.] has grown both developmentally and physically much more quickly since he was taken from his mother's custody. The court concludes that it is likely that the mother's own struggle to meet her own basic needs, despite significant disabilities, and without supports for herself that might have assisted her, interfered with her ability to care for others, including [M.S.], despite her good intentions. Mother's stress and anxiety, her frustration when things did not work out as she had hoped, or when she became overwhelmed, her inability to calm herself, and her occasional outbursts of anger increased [M.S.'s] stress, and were an obstacle to his development. The mother's acts of abuse towards [M.K.] on April 21, 2014 are also a factor here. [M.S.] was a witness to that incident, and that can only have been traumatic and painful for him to see. . . . The mother's other outbursts of anxiety, distress, and anger at the childcare center, and at visits, show that this was not an isolated incident of loss of temper and control.

Mother appeals the family court's CHINS decision, arguing that: (1) the court's conclusion that M.S. was CHINS was based on an impermissible assumption that a person with a disability cannot be a good parent; (2) the court erred in taking judicial notice of the findings in the prior CHINS proceeding; and (3) the evidence does not support the court's findings or its CHINS adjudication.

At the outset, we reject mother's argument that the family court erred by taking judicial notice of the findings in the prior CHINS proceeding. In the merits decision on appeal in the instant CHINS proceeding, the court found that "[t]he parties stipulated in this case that the court could take judicial notice of its findings in [the earlier CHINS] case." Mother does not challenge this statement, which is supported by the record. By expressly agreeing to allow the family court to take judicial notice of the findings in the prior CHINS proceeding, mother has waived this claim of error on appeal. See In re D.C., 2012 VT 108, ¶ 13, 193 Vt. 101 (concluding that mother waived right to challenge on appeal procedure that she stipulated to in family court).

Next, we consider mother's argument that the family court's adjudication of CHINS was based on its impermissible assumption that a person with a disability cannot be a good parent. Mother presumes that the court made this assumption based on the court's statement, quoted above, that despite mother's good intentions, her significant disabilities and lack of supports for herself that might have assisted her interfered with her ability to care for M.S. We will not presume from this statement that the court based its decision in this case on its belief that a person with a disability cannot be a good parent. The court's focus was on whether M.S. was

2

without proper parental care to the degree that it affected his well-being. In addressing that question, the court considered mother's conduct, which was impacted by her disability. The fact that the court noted the impact of mother's disability on her conduct towards M.S. and others does not suggest that the court was adjudicating M.S. CHINS because mother had a disability. Rather, the court addressed whether mother's inability to control the symptoms of her disability left M.S. without proper parental care such that it negatively impacted his well-being. In short, the focus was on M.S. and only indirectly on mother's disability.

The real issue in this case—whether the State's evidence supports the family court's conclusion that M.S. is without proper parental care—presents a close question. Mother acknowledges that there was plenty of evidence demonstrating that M.S. has significant special needs and that mother has a disability—a traumatic brain injury from a childhood accident—that affects her emotions and impulse controls. But she contends that there is virtually no evidence demonstrating that M.S.'s special needs resulted from her not providing M.S. with proper parental care or that her disability had any impact on his physical or emotional development.

As indicated above, the family court concluded that M.S.'s failure to develop physically and mentally as fast as he should have was due in part to mother's inability, despite her efforts, to provide him with the care he needed to thrive, given his special developmental needs. The court based this conclusion "largely on the fact that [M.S.] has grown both developmentally and physically much more quickly since he was taken from the mother's custody." The court cited mother's own stress and anxiety and her inability to control her emotions and temper as obstacles to M.S.'s development.

Mother argues that the evidence does not support the family court's finding that M.S. developed much more quickly since he was taken into DCF custody, and that the court's findings do not support its conclusion that M.S. was without proper parental care or that M.S.'s slow development was the result of her conduct. She points out that the only doctor to testify at the CHINS hearing had seen M.S. one time after he came into foster care and did not testify that M.S. had developed significantly after coming into DCF custody. Mother acknowledges that after coming into DCF custody M.S. moved from the fourth percentile to the eighth percentile in weight, but argues that no evidence indicated that such a change was significant. According to mother, contrary to the court's finding of neglect, the evidence demonstrates that she was persistent in providing M.S. with medical attention, nutritionists, preschool, and other services.

As noted, mother does not challenge evidence concerning her conduct, which apparently stems from her disability. She does not dispute the family court's findings concerning how her disability made it difficult for her to control her emotions and impulses. The court described one incident when mother became upset while at M.K.'s daycare and deliberately banged her head against the cubbies where the children had their clothing. The director of M.S.'s child care center testified that mother "could turn on me" and become aggressive "in a moment's notice when we were having a conversation if something went askew that she didn't like." She would swear and become so agitated she would begin to shake and "have this facial expression like she was going to blow or hit something." She testified that mother's behavior "really frightened me"

and she "just didn't know when it was going to happen" or "what I might say that would turn it." She described mother coming into the center like a "whirlwind" with a lot of "stress and anxiety" and how she would lose her temper with M.S., "grabbing him." She testified that mother "was just like a stress ball entering the program, and everybody around her felt it, parents complained." She described this conduct on mother's part as occurring "regularly." Asked how M.S. reacted to this behavior, the director testified that he would either "shut down" or be "screaming."

The DCF caseworker assigned to M.S. also testified about mother's conduct. He observed her on several occasions "become overwhelmed emotionally and have a physical response." He described an incident in the spring of 2014 when mother became confrontational, raising her voice and putting her arms in the air, after wrongly assuming that he was changing a visiting schedule. According to the caseworker, the children who were present reacted by putting their heads down and becoming quiet. The caseworker also testified that mother had similar physical responses at team meetings and on one or two occasions swore and became verbally aggressive. In considering mother's conduct, the court also took into account the incident that led to the first CHINS petitions, in which she flung M.K. to the ground in the presence of M.S.

Nor does mother challenge the evidence or the court's findings concerning M.S.'s special needs. A child interventionist and pediatric physical therapist who had worked with M.S. since he was six months old described M.S. as a "quite rigid" baby who "moved very quickly through space" and "had a hard time regulating himself" and "was easily overwhelmed by his environment." She likened M.S. to "a little pinball" who "couldn't sustain attention to a toy" or "get comfortable." She testified that he was so stiff that he had difficulty grasping a toy and that his constant movement was unsafe at times. She stated that they tried to slow things down for him by giving him "really controlled sensory stimulation" to relax his muscle tone. The therapist testified that after M.S. began walking he paid little attention to obstacles in his environment, just plowing through them, and he showed "all along decreased responsiveness to pain." The court's unchallenged finding, based on this and other testimony, was that M.S. "needed a calm, quiet environment to work on all of these issues."

While mother acknowledges the family court's findings regarding her conduct and M.S.'s needs, she rejects the court's conclusion that her behavior has played a role in M.S.'s developmental delays to the point that the child is without proper parental care. We conclude that there is sufficient evidence of a connection between mother's actions and M.S.'s developmental delays for the court to adjudicate the child CHINS.

A pediatrician who examined M.S. in June 2014 at his eighteen-month checkup testified about the history of M.S.'s checkups at her office and the various concerns arising out of those checkups. The pediatrician testified that M.S.'s weight, height, and head size were within the normal range at birth but became a concern later. According to the pediatrician, at M.S.'s six-month visit, her office was becoming "very concerned" about M.S.'s failure to gain weight. There were also concerns that M.S. was behind in language and problem-solving skills. At

4

eighteen months, M.S. was in the eighth percentile for weight and the first percentile for head circumference. The pediatrician testified that there did not appear to be any medical reason for the failure to gain weight, and preliminary tests failed to show that autism was a factor or that there were other genetic factors. She also generally testified that a child's environment is "a huge factor," and that the effects of "toxic stress in the home" can have "a huge impact on children." She stated that she could not know for sure what was causing M.S.'s small head and failure to gain weight, but that there was a "disconnect" between what mother was saying about M.S.'s development and the concerns raised by service providers.

Several witnesses testified about M.S.'s condition both before and after he was removed from mother's custody. The physical therapist testified that M.S. would get rigid, intensely distressed, and less available for being consoled in a loud, chaotic environment. She stated that she and mother "had several discussions on how [M.S.] was very sensitive to how she was feeling." When asked if she had seen changes in M.S. since he had been taken into DCF custody, the therapist stated that M.S. initially had a difficult transition but within two to three weeks seemed "really happy, laughing, starting to attend more to toys." According to the therapist, once M.S. got into a consistent routine, "he looked very relaxed, not as stiff, sustaining attention to tasks" and was "becoming better at controlling the speed and direction of his movement through space."

M.S.'s DCF caseworker also saw significant changes since M.S. had come into DCF custody. He testified that when M.S. first came into DCF custody he would want to play by himself and would move from one thing to the other very quickly and recklessly. According to the caseworker, by the time of the merits hearing three months later, M.S. appeared to be more interactive while playing. Similarly, the director of the child care center that M.S. attended from November 2013, when he was eleven months old, until August 2014 testified about M.S.'s "phenomenal" progress since coming into DCF custody. The director testified that when M.S. came into DCF custody, he was hyper and anxious and "out of control in his body." He moved over toys and other children "like they didn't exist." According to the director, M.S. had a "flat affect." His eyes were vacant, and he did not respond to people or make normal eye contact with them. His verbal communication skills were underdeveloped. He was very pale and "extraordinarily thin." The director testified that within a couple weeks of being placed in DCF custody, M.S.'s appearance and behavior "changed dramatically." Moreover, he was coming into daycare with food that was in line with what the nutritionist was recommending, and he noticeably gained weight and his hair began to thicken. His complexion became rosier and his eyes clearer. He begin playing with other children in a purposeful way, and he began going to caregivers when he was hurt or experienced pain. The director testified that she regularly observed M.S. because of her concern for him and that there was "no doubt . . . in [her] mind" that the change in his appearance and behavior occurred after he was taken from mother's home.

The above evidence indicated that M.S.'s special needs required a structured, non-stressful environment, and that mother was unable to provide such an environment, resulting in M.S.'s failure to develop. Although much of the evidence was circumstantial in nature, it was sufficient for the family court to conclude that M.S.'s developmental delays were the result, at

least in part, of a stressful home environment resulting from mother's failure to regulate her emotions and impulses, and that M.S. was CHINS because of his failure to thrive in mother's care.  Like the State, we entirely agree with mother that a parent's disability, in and of itself, cannot be a sufficient basis to support a CHINS adjudication.  But when there is evidence, as here, that the parent's behavior—irrespective of whether it is a result of a disability—is the cause of a child's failure to thrive, that evidence may support a CHINS adjudication.  See In re D.D., 2013 VT 79, ¶ 34, 194 Vt. 508 (stating that family court's factual findings will be upheld "unless clearly erroneous and the court's legal conclusions [will be upheld] when supported by those findings").  In any event, we reiterate that "[t]he focus of a CHINS [merits] proceeding is the welfare of the child," In re C.P., 2012 VT 100, ¶ 28, 193 Vt. 29; that "parents' rights are at most temporarily curtailed in a CHINS [merits] proceeding," In re M.L., 2010 VT 5, ¶ 7, 187 Vt. 291; and that it is at the disposition phase of the proceedings that "the determination of parental unfitness, which triggers the transfer of custody away from the parents, must be made."  In re B.R., 2014 VT 37, ¶ 14, ___ Vt. ___ (quotation omitted).

Affirmed.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
John A. Dooley, Associate Justice


_____
Beth Robinson, Associate Justice

6