*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2015-452

MAY TERM, 2016

In re E.H., Juvenile

}    APPEALED FROM:
}
}    Superior Court, Caledonia Unit,
}    Family Division
}
}    DOCKET NO. 37-4-13 Cajv

Trial Judge: M. Kathleen Manley

In the above-entitled cause, the Clerk will enter:

Mother and father separately appeal from a family court judgment terminating their parental rights to the minor, E.H. Mother contends the court erroneously placed the burden of proof on mother to prove that reunification, and not termination, was in the child's best interest. Father joins in mother's claim, and further contends that the court erred by imposing an "unreasonable standard of supervision" of the child and by finding that father was not seeking reunification. We affirm.

The facts may be summarized as follows. DCF filed a child in need of supervision (CHINS) petition in April 2013 after mother left both E.H. and his brother C.H. unattended in the bathtub while she left to check on dinner, talk on the telephone, and help a neighbor. When she returned, she found C.H. underwater and unresponsive. He was pronounced dead at the hospital. C.H. was five years old and E.H. was three years old at the time. Both are on the autism spectrum. E.H. was originally placed with father under a conditional care order that limited contact with mother to supervised visits, but the court transferred custody to DCF in October 2013 after father left the marital home and moved temporarily to Tennessee. E.H. has since remained in foster care. Father has not seen E.H. since September 2013.

The parents stipulated to an adjudication of the CHINS petition by clear and convincing evidence at the merits hearing in May 2013. A case plan adopted in August 2013 established a goal of reunification and a number of parental services and requirements, including substance abuse treatment and testing, and mental health assessments and counseling. An amended plan adopted in January 2014 established concurrent goals of reunification or adoption by June 2014 and supplemented the plan of parental services with Easter Seals Family Time coaching, which mother had already been receiving for several months. In September 2014, DCF filed petitions to terminate parental rights. The court held a two-day evidentiary hearing, and issued a written decision in November 2015.

With respect to mother, the court found that despite intensive services from Easter Seals and other providers, mother's ability to maintain a safe environment for E.H. remained a major concern. Her home remained filthy; she resisted advice and suggestions; and she failed to

consistently engage in Family Time meetings where the focus was on safety and oversight of the child by mother. Most concerning to her service providers was mother's failure to accept prompts and suggestions about the need to maintain supervision of E.H.; she was continually distracted and consistently failed to monitor E.H. while outside or at playgrounds or crossing the street, allowing him to fall, run off, and cry without concern or intervention. As a result of ongoing safety concerns, mother's contact with child did not move beyond supervised contacts. The court also found that mother had not acknowledged any responsibility for C.H.'s death. The court noted that, when asked about the circumstances, mother had invoked her right against self-incrimination under the Fifth Amendment and expressly declined to draw an adverse inference from mother's silence.

Although the court acknowledged that mother had met many of the case plan goals, it found that—despite the provision of intensive services over a lengthy period—she continued to struggle to provide a safe environment even in a structured setting under close supervision. She also continued to resist help and advice, and to insist that she had nothing to learn about safe parenting. With respect to the tragic circumstances surrounding C.H.'s death, the court found that, while the definitive "cause or manner" of death may never be known, it indisputably involved "a young child with autism being left alone in a bathtub during which time he died," and mother had since "continued to demonstrate a lack of diligence in safe parenting, despite supports and interventions." The court thus determined that mother's overall failure to progress supported a finding of stagnation, which demonstrated in turn a substantial change of circumstances.

Turning to the statutory best-interests criteria, the court concluded that, although mother loved E.H. and had played a constructive role in his life through consistent visits, she could not safely resume parental responsibilities. She resisted instruction on maintaining supervision, indeed saw no need to learn anything about safe parenting, and had demonstrated no understanding or insight about the potential risk to E.H. from her behavior, notwithstanding E.H.'s autism diagnosis. The court thus concluded that mother could not "safely parent [E.H.] and [that] a reasonable time to demonstrate same has passed, particularly when viewed from the perspective of [E.H.], who requires consistent, steady and safe parenting to meet his ongoing challenges and future development."

As to father, the court noted that he had not seen E.H. since September 2013, had engaged in none of the prescribed services, provided no support for E.H., and acknowledged that "he is still not ready to undertake the services nor is he able to provide care for [E.H.] at this time." The court thus found that stagnation had occurred. As for father's ability to resume parental responsibilities, the court found that he "acknowledge[d] an inability to be available for [E.H.], but nevertheless argued for denial of the petitions to allow mother more time to reunify, with the goal of his "reintegrating into [E.H.'s] life at some point in the future."

In the meantime, the court found that E.H. had made significant progress in his cognitive development and emotional health while living with his foster family, but continued to require stable and consistent caretakers to manage his significant needs. Accordingly, the court concluded that termination of the parental rights of mother and father was in the best interests of the child. These appeals followed.

2

Mother's sole contention on appeal is that the trial court improperly shifted the burden of proof to mother to prove that reunification, and not termination, was in the child's best interests. See In re J.R., 164 Vt. 267, 270 (1995) ("The State must prove by clear and convincing evidence that there has been a material change of circumstances and that the best interest of the child requires termination of parental rights and responsibilities."). Mother relies on the court's statement that "the parents must demonstrate that it is in [E.H.'s] best interest to reunify."

Although on its face, and considered in isolation, the court's statement is problematic, its context belies any suggestion that the court was intending to reverse the normal burdens of proof in a termination-of-parental-rights proceeding. It was made in the course of an extended discussion of whether to draw a negative inference from mother's invocation of her Fifth Amendment rights when she was questioned about the circumstance of C.H.'s death, and the court appears to have been referring to an earlier citation to In re M.C.P., 153 Vt. 275 (1989). There, as the trial court noted, this Court had observed that, while the parents in that case could not be required under the Fifth Amendment to admit their sexual abuse of the child, they still needed to "respond to findings of severe physical and sexual abuse if they are to make any progress toward reunification." Id. at 301. Although inartfully phrased, the court's statement appears to have been an effort to say the same thing, that mother needed to address the significant concerns raised by the circumstances of C.H.'s death to make progress toward reunification. As the court further found, however, the evidence showed that mother had made little or no progress in recognizing the profound concerns raised by C.H.'s death and addressing the issues that remained about her ability to safely parent E.H. The court repeatedly explained that its findings and conclusions were supported by clear and convincing evidence, and its analysis reflects that it did not, in fact, shift the burden to parents. Accordingly, we find no error.

Father separately contends that the court placed "an unreasonable standard of supervision" on the parents to "guarantee the safety" of E.H., beyond what might be required of any other parent. Father relies on certain examples of mother's inattention noted in the court's findings, such as a failure to monitor E.H.'s candy consumption or supervise his playground play to prevent injury. He maintains that termination may not be predicated merely upon a parent's failure to be "hypervigilant." The court's decision, however, was not predicated on a few examples, but on a persistent pattern of inattention and neglect of significant safety risks to E.H. observed over time by service providers and others. Moreover, the court did not overly focus on C.H.'s death, as father suggests. The court acknowledged that an accident could happen to any child "even when cared for by an attentive parent." In light of the evidence, however, it noted that C.H.'s death could not be viewed in isolation, but as background to an ongoing pattern of lack of "diligence in safe parenting." We thus find no error.

Father further contends the court erred in finding that he "was not seeking reunification with E.H." To reiterate, the court found that father acknowledged that he was not currently "able to provide care for E.H." but "advocate[d] . . . that the court deny this petition and allow [mother] more time to reunify" with a goal of his "reintegrating" into E.H.'s life in the future. These findings fairly reflected father's testimony that he understood there were "many hoops . . . to jump through as far as therapy and parenting and substance abuse" before he had the "stability" to reunify with E.H., and that his goal "in the long run" was to have E.H. released either to his or to mother's custody. Father also suggests that the court's decision was inadequate because it did not specifically find that he was unfit to parent. The court's findings that father had not seen E.H. for more than a year and a half, had engaged in none of the

prescribed services, and was not able to parent E.H. were sufficient to support its decision. An express finding of "unfitness" was not required. In re D.C., 2012 VT 108, ¶ 22, 193 Vt. 101 (noting the best-interest criteria "encompasses both directly and indirectly the question of parental fitness").

Affirmed.

BY THE COURT:

_____
Marilyn S. Skoglund, Associate Justice

_____
Beth Robinson, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice