VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      23-AP-190

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

NOVEMBER TERM,   2023

In re M.C., Juvenile
(M.G., Father\*)

}
}
}
}
}
}

APPEALED FROM:

Superior Court, Chittenden Unit,
Family Division
CASE NO. 529-11-18 Cnjv
Trial Judge:  A. Gregory Rainville

In the above-entitled cause, the Clerk will enter:

Father appeals from the termination of his parental rights in his five-year-old son, M.C.[1] We affirm.

The family division found as follows.  M.C. was placed in the custody of the Department for Children and Families (DCF) in November 2018 at three months old, after mother was cited for driving under the influence with him in her vehicle.  The same month, the court found that M.C. was a child in need of care or supervision based on mother's stipulation that her alcohol abuse put him at risk of harm.  In March 2019, the court approved a disposition case plan calling for reunification with either parent by November 2019.  Father's action steps included communicating with DCF about whether he wanted to be a reunification option, notifying DCF when he would be in Vermont in order to arrange for visitation, maintaining safe and stable housing, meeting with a domestic-violence specialist for an assessment, and providing M.C. with a nurturing environment free from substance abuse and domestic violence.

At the time the initial disposition plan was approved, M.C. was placed with his paternal grandmother, and father was traveling back and forth between Florida and Vermont.  Visits with M.C. were initially held at the DCF office but began occurring in paternal grandmother's home around July 2019, at which point father started attending more frequently.  The following month, father was arrested on charges of assaulting mother, and the DCF worker assigned to the case informed him that, as a result, they needed to meet before he could resume visits with M.C. Father failed to attend the scheduled meeting.  Father then agreed to be present at a September family safety-planning meeting to discuss the resumption of visits but again failed to attend.  In October, the DCF worker reached out to father and once more requested that they meet to

---

[1]  Mother's rights were also terminated; she did not appeal.

discuss his visits with M.C., but no meeting occurred because of father's lack of responsiveness. If father saw M.C. in the late summer and fall of 2019, he did so without DCF's knowledge.

In November 2019, the court approved a permanency plan in which the sole goal was reunification with mother; it did not find that reunification with father was justified. The following month, M.C. was placed in mother's custody pursuant to a conditional custody order (CCO) which required her to ensure that any contact between father and M.C. was supervised by an individual approved by DCF. Additionally, father had conditions of release in pending criminal cases which prohibited him from having contact with mother. Despite these circumstances, father resided with mother and M.C. between December 2019 and his February 2020 arrest on a federal charge. Following this arrest, father was incarcerated for almost a year.

While father was still incarcerated, mother was arrested for driving under the influence with M.C. in the car once again. As a result, M.C. was placed with mother's former stepfather pursuant to a CCO in June 2020. Former stepfather's partner was later added to the CCO. M.C. has been in their care since that time.

Father was released in January 2021 but was reincarcerated approximately nine days later after being cited on a new criminal charge, violating the terms of his supervision. During the same month, the court amended the disposition order to a concurrent plan of reunification with mother or adoption within six months. It does not appear that an amended disposition case plan was filed or adopted. M.C. filed petitions to terminate parents' rights in June 2021.

Father was again released in May 2021 and, at some point thereafter, sought visitation with M.C. and received a referral to Lund's supervised visitation program. Though the referral process began in August 2021, there was a delay in father's approval to participate due in large part to Lund requiring information from him about his criminal record. Though father was ultimately approved in February 2022, visits did not begin until March as a result of cancellations by both father and M.C.'s conditional custodian. While the conditional custodian cancelled some visits due to illness or inclement weather, father also cancelled two of the scheduled visits. Shortly after visitation through Lund commenced, father violated his federal probation by using cocaine and was incarcerated for thirty days at the beginning of April 2022. Father explained that he had been experiencing depression and anxiety, and noted that when his mental health declines, he is more likely to use substances. He failed to notify Lund that he could no longer attend visits due to his incarceration, resulting in his discharge from the program.

After his release in May 2022, father attended an inpatient substance-use treatment program. In June, father notified the DCF worker that he was ready to resume visits with M.C. Though the DCF worker responded the same day offering to set up a meeting about visits, father did not reply for over a month. The meeting ultimately occurred at the end of August 2022. During the meeting, the DCF worker advised father that he should participate in classes focused on parenting a child with trauma and parenting a child with DCF involvement. Father was unwilling to participate in the classes. The DCF worker asked father to sign releases for his providers. He replied that he had no current providers but would sign releases so that his past providers could share information with DCF. However, father did not sign the releases.

Father sought a relief-from-abuse order against mother in June 2022, alleging that she had been violent toward him and once threatened to kill him, but the matter was dismissed after father did not attend the final hearing. Though father acknowledged that his relationship with mother was toxic and he believed he needed to distance himself from her if he hoped to remain

sober and parent M.C., he continued to associate with her during the following months. Law enforcement was summoned twice in July and once in September because of mother's alleged behavior toward father.

Father had been on a waitlist to resume supervised visits with M.C. through Lund in late September of 2022. Everything was in place to resume contact, but father was incarcerated again at the beginning of October 2022 and the visits never took place. At that time, father was facing five federal felony charges for possession of stolen property and the likelihood of a lengthy prison sentence. When the termination-of-parental-rights hearing concluded in February 2023, father remained incarcerated, and the court found it highly unlikely that he would return to the community at any point in the near future.

In its final order on the petition to terminate father's parental rights, the family division first found a substantial change in circumstances. The amended disposition order approved in January 2021 contemplated reunification or adoption by July 2021, but father remained incarcerated at the conclusion of the termination proceedings and had not had contact with M.C. in nearly a year. Other than a few supervised visits in March 2022, father had very little contact with M.C. following his February 2020 incarceration. The court then weighed the factors set forth at 33 V.S.A. § 5114 and concluded that termination of father's parental rights was in M.C.'s best interests. M.C., then four-and-a-half, had bonded with his conditional custodians and their respective children, and was adjusted to his home, school, and community. The family division found that father had no bond with M.C., who did not ask about him or even seem to understand who he was. Father's own behavior led to his incarceration and the imposition of conditions limiting his contact with M.C. and precluded his meaningful participation in the Lund visitation program. He was likely to receive a substantial sentence on pending felony charges, and the court found it highly unlikely that father would return to the community or be able to commence parental duties at any time in the near future. In order to assume those responsibilities upon his release, father would need to allow DCF to access information about his federal conditions of release and verify his compliance with those conditions, undergo a substance abuse and mental-health assessment—given his indication that his mental health and substance us were linked—and then follow treatment recommendations and demonstrate his sobriety, and, most importantly, build a relationship with M.C. through regular, consistent contact. The court thus concluded that even if father were immediately released, he would be unable to resume parental duties in a reasonable time from M.C.'s perspective.

On appeal, father argues that: the court should not have found a change in circumstances because DCF failed to provide him with adequate services or to arrange for him to have visitation with M.C. while he was incarcerated; the court's conclusion that he would be unable to resume parental duties in a reasonable period was unsupported because the finding that he made no progress on the case plan is clearly erroneous; and the court failed to construe the best-interests criteria in accordance with the statutory purpose to preserve the family when it terminated father's parental rights.

When termination of parental rights is sought after initial disposition, the trial court must first determine whether there has been a change in circumstances and, if so, whether termination is in the child's best interests. In re A.M., 2020 VT 95, ¶ 25, 213 Vt. 402; see also 33 V.S.A. § 5114. "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion" in terminating parental rights. In re S.B., 174 Vt. 427, 429 (2002) (mem.). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re G.S., 153 Vt. 651, 652 (1990) (mem.).

3

We turn first to father's argument that the family division erred in finding changed circumstances because stagnation was caused in part by factors beyond his control. See In re S.R., 157 Vt. 417, 421-22 (1991) (holding that stagnation caused by factors beyond a parent's control cannot support termination of parental rights). He suggests that stagnation was attributable, at least in some measure, to DCF's failure to make "reasonable efforts" to provide him with adequate services or facilitate visits at the correctional facility while he was incarcerated where the conditional custodians allegedly refused to do so.[2]

We first note that though the court found that mother had stagnated, it made no such express finding as to father. See In re D.C., 2012 VT 108, ¶ 18, 193 Vt. 101 (explaining that though changed-circumstances requirement is most often met by showing stagnation in a parent's ability to care for child, "stagnation is not the only way to show changed circumstances"). Instead, it found that father's continued incarceration and very limited contact with M.C. led to a substantial change in material circumstances. In any event, we need not further consider whether stagnation was the basis of the court's finding of changed circumstances as to father. Assuming for the sake of argument that it was, father has failed to identify portions of the record supporting his argument that stagnation was attributable in part to factors beyond his control because DCF did not provide him with adequate services or arrange for M.C. to visit him during his incarceration. See V.R.A.P. 28(a)(4)(A) (providing that appellant's principal brief must contain "appellant's contentions and the reasons for them—with citations to the . . . parts of the record on which the appellant relies"); see also In re S.B.L., 150 Vt. 294, 297 (1988) (holding that it is appellant's burden "to demonstrate how the lower court erred warranting reversal[,]" and "[w]e will not comb the record searching for error"). Moreover, the court's unchallenged findings about factors within father's control amply support its conclusion that the changed-circumstances threshold was satisfied as to father. See In re M.M., 159 Vt. 517, 522 (1993) (noting that "the changed circumstances test is met when the findings in the case are replete with facts sufficient to meet the required standard" (quotation omitted)).

With respect to DCF's provision of services, father did assert in his statement of the case that he "testified credibly that some of the case plan steps could not be completed due to lack of referrals." However, we cannot conclude that father thereby identified record support for this argument, because the only citation offered is to his own proposed findings filed at the conclusion of the termination hearings. The trial court made no such credibility finding and did not discuss any testimony by father on this point. Rather, as to services, the court's findings reflect that father declined to participate in parenting classes recommended by DCF, failed to sign releases so that DCF could communicate with his providers, and was substantially unable to engage with Lund's supervised visitation program as a result of his choices to engage in behavior resulting in incarceration and his failure to communicate with Lund about that incarceration. See In re D.S., 2014 VT 38, ¶ 26, 196 Vt. 325 ("[O]ur case law makes clear that a parent is responsible for the behavior that leads to incarceration and for the consequences that come with such incarceration."). Father does not challenge these findings, which reflect that he was offered services and failed to take advantage of them. Nor does he identify any other services which he believes, if provided, would have precluded changed circumstances here.

---

[2] We assume that in employing the term "reasonable efforts," father did not intend to challenge the court's reasonable-efforts findings, see 33 V.S.A. §§ 5308(e)(1)(B), 5321(h)(1), insofar as he has not appealed any such determination. See also In re D.F., 2018 VT 132, ¶ 49, 209 Vt. 272 (explaining that while the same evidence may be relevant to both, reasonable-efforts determination and termination decision "present distinct issues").

Father likewise identifies no record support for his argument that DCF should or could have arranged for M.C. to visit him while he was incarcerated in order to promote a healthy relationship between them. See, e.g., In re M.H., No. 2015-004, 2015 WL 1761725 at *2 (Vt. April 10, 2015) (unpub. mem.) [https://perma.cc/6LP6-AW52] (finding father failed to demonstrate that his lack of contact with children was due to factors beyond his control where his behavior resulted in lengthy incarceration during which DCF did not arrange for visits where "[t]he court found that it was reasonable for DCF to determine not to bring very young children to visit a father with whom they have never had a significant relationship and who could not be a realistic placement"). Regardless, the court's finding of changed circumstances was amply supported even without considering the lack of visitation between M.C. and father during his periods of incarceration. See In re B.S., 163 Vt. 445, 454, 659 A.2d 1137, 1143 (1995) (noting that reversal is required only where error results in prejudice). Though father faults DCF for failing to arrange for visitation in the correctional facility, during the periods of time when father was in the community, his own choices and the consequences thereof prevented him from engaging with Lund's visitation program and availing himself of the opportunity to build a relationship with M.C. and work toward reunification. During his periods of incarceration, regardless of whether visits occurred, father was not available to provide day-to-day care for M.C. At the time the termination proceedings concluded, it was likely that father would remain thus unavailable for a lengthy period of time. On the basis of these unchallenged findings, changed circumstances were manifest. See In re M.M., 159 Vt. at 522. The court did not abuse its discretion when it found this threshold was met.

Next, father argues that the evidence did not support the conclusion that he would have been unable to resume parental duties within a reasonable period because the finding that he made "no progress" on the case plan was clearly erroneous. However, the court did not find that father made no progress on the case plan. Rather, its assessment of the likelihood that father would be able to resume parental duties within a reasonable period was predicated on its finding that even if father were immediately released—which the court did not find probable—the steps he would need to take in order to successfully reunify with M.C. could not be accomplished within a reasonable period given M.C.'s age and the length of time he had been out of the care of his parents. Father does not challenge the court's findings that, in order to reunify following release, he would need to share information with DCF about his conditions of release and verify his compliance therewith, undergo substance abuse and mental-health assessments and follow resulting treatment recommendations, demonstrate his sobriety through random drug screens, and, most importantly, build a relationship with M.C. through regular and consistent contact. In light of these findings, the family division did not err in concluding that father would be unable to resume parenting within a reasonable period of time from the perspective of M.C.'s needs. See In re G.S., 153 Vt. at 652 (observing that we will affirm the family division's conclusions where supported by its findings). Father's contention that he demonstrated historically that he could parent M.C. is not supported by any record citation, see V.R.A.P. 28(a)(4)(A), and in any case does not undermine the family court's analysis, which was appropriately focused on father's prospective ability to parent. In re D.F., 2018 VT ¶ 41 ("Determining whether a parent will be able to parent within a reasonable period of time is forward-looking, that is, the court must consider a parent's prospective ability to parent the child." (quotation omitted)).

Finally, father argues that the family division abused its discretion in concluding that the best-interests factors weighed in favor of termination of his parental rights where he sought only "a short extension of time" to complete his incarceration and continue his progress on the case plan. He suggests that the court failed to construe the best-interests factors in accordance with 33 V.S.A. § 5101(a)(3), which requires that the provisions of the Juvenile Proceedings Act be construed "to preserve the family and to separate a child from his or her parents only when

5

necessary to protect the child from serious harm or in the interests of public safety[.]"  However, § 5101(a) also requires that courts construe the Act "to ensure that safety and timely permanency for children are the <u>paramount</u> concerns in the administration and conduct of proceedings" thereunder.  33 V.S.A. 5101(a)(4) (emphasis added).  Consistent with the purposes set forth at § 5101(a), courts are to consider the best-interests factors at § 5114, the most important of which is whether the parent will be able to resume parenting duties within a reasonable period.  See <u>In re J.B.</u>, 167 Vt. 637, 639 (1998) (mem.).  The family division did not abuse its discretion when it weighed the best-interests factors and concluded that given M.C.'s age, the amount of time he had been out of the care of both parents, and the length of time it would take for either parent to accomplish what was necessary to achieve successful reunification, it was not in M.C.'s best interests to delay permanency.

<u>Affirmed</u>.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice

_____
Harold E. Eaton, Jr., Associate Justice

_____
William D. Cohen, Associate Justice