NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 100

No. 2015-019

| | |
|---|---|
| In re R.B., O.B. and K.C., Juveniles | Supreme Court |
| | On Appeal from<br>Superior Court, Orange Unit,<br>Family Division |
| | June Term, 2015 |

Robert P. Gerety, Jr., J.

Allison N. Fulcher of Martin & Associates, Barre, for Appellant Father.

Michael Rose, St. Albans, for Appellant Mother.

William H. Sorrell, Attorney General, Montpelier, and Jody Racht, Assistant Attorney General, Waterbury, for Appellee.

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ.

¶ 1. **REIBER, C.J.** Mother appeals from the trial court's order terminating her parental rights in R.B., O.B., and K.C. Father appeals the termination of his parental rights in O.B. and K.C.[1] We affirm.

¶ 2. R.B. was born in September 2008; O.B. in December 2009; and K.C. in September 2011. In August 2012, the Department for Children and Families (DCF) filed a

_____

[1] The father of R.B. did not attend the termination hearings in this case. At the time of its termination decision, the court could not determine if R.B.'s father received notice of the CHINS petition or the subsequent hearings. The court consequently did not terminate his rights in the TPR decision on appeal here. The court later terminated R.B.'s father's rights in a February 2015 order. Any reference to "parents" or "father" in this decision does not refer to R.B.'s father.

petition alleging that the children were in need of care or supervision (CHINS) because they were without proper parental care. Several days later, the parties stipulated, and the court found, that the children were CHINS. The court transferred temporary legal custody of the children to father's mother subject to a conditional custody order.

¶ 3. Following an August 28, 2012 hearing, the court issued a disposition order that established a concurrent permanency goal of reunification with parents or adoption. The court adopted DCF's case plan with the exception of the recommendation that the children be placed in DCF custody. Parents proposed that the child be placed in the temporary custody of father's cousin Kristin Hall and her wife Tammy Hall pursuant to a conditional custody order. The Halls had four children and lived in a four bedroom house. DCF did not support the placement because the Halls could not obtain a license due to the number of children that they would have in the home. DCF also indicated that it had not yet had the opportunity to do a home study and evaluate the home.

¶ 4. The court concluded that placing the children with the Halls pursuant to a conditional custody order was in the children's best interests. See 33 V.S.A. § 5318(e) ("Whenever the Court orders the transfer of legal custody to . . . a relative . . . , such orders shall be supported by findings regarding the suitability of that person to assume legal custody of the child and the safety and appropriateness of the placement."). The court found it best to place the children with relatives if possible, and determined that the Halls could take proper care of the children, at least in the short run, while work was done on the disposition plan.

¶ 5. In mid-December 2013, DCF moved to terminate parents' rights.[2] Parents subsequently moved to enforce their right to have parent-child contact. They asserted that Kristin Hall was not cooperating with visitation and asked the court to order her and DCF to

---

[2] Around the same time, the court amended the disposition order to remove Tammy Hall as temporary custodian of the children as the Halls were no longer a couple.

2

follow the terms of the CCO, which called for parents to have consistent parent-child contact. The court indicated that if visitation continued to present a problem, it would consider this issue at the TPR hearing.

¶ 6. In April 2014, the court held a two-day termination hearing. The court had not issued a decision by mid-October 2014, and at that time, the guardian ad litem and attorney for the children requested a status conference to address several issues that had arisen since the TPR hearing. DCF also filed a motion, renewing the request made in its TPR petition that custody and guardianship of the children be transferred to DCF. DCF indicated that this would enable it to assist the adoptive parent in the adoption process. Additionally, as set forth in an attached affidavit, DCF stated that it would be better able to address concerns that had arisen about the children's current placement with Ms. Hall, concerns that had become known to DCF subsequent to the TPR hearing.[3]

¶ 7. The court did not directly respond to these requests, but instead issued its TPR decision on November 10, 2014. It found as follows. Mother suffers from rare disorders known as Munchausen's disorder and Munchausen's disorder by proxy. Munchausen's disorder by proxy is potentially fatal to the children of a parent who suffers from the disorder. It is an extremely unusual disorder, and it often takes a long time before medical providers become aware that their minor patients have a parent suffering from the disorder.

¶ 8. Mother had little or no insight into her disorders. She had been successful at times in manipulating health care providers to treat nonexistent symptoms as to which there was no medical evidence. Mother's conditions prevented her from parenting the children safely, and the children were at grave risk of physical harm if they were left in mother's care without around-the-clock, eyes-on, supervision. Treatment for mother's condition is extremely difficult and generally involves years of psychotherapy. This is particularly true for patients like mother

---

[3] The attorney for the children later indicated that he did not receive a copy of this filing.

who lack insight into their condition. The court could not find that mother was likely to recover from these disorders at any particular time. It found no reasonable probability that mother could resume her parental duties within a reasonable period of time.

¶ 9. The court explained that child service agencies had been involved in parents' lives since May 2010 when mother and father were living in Tennessee. There were reports at that time about illicit drug use and sales, nutritional neglect, and medical maltreatment of the children by mother and father. The parties moved to Vermont in May 2011 where they lived in a mobile home with father's mother. There were a variety of significant problems at that time that affected the children's safety. Mother was not obtaining necessary mental health treatment and parenting education. The housing that parents provided for the family was not adequate. The home was consistently dirty and severely cluttered to the point that it presented a physical danger to the children. Despite requests by social workers to address the problem, parents were often unable or unwilling to devote the time necessary to provide adequate and safe housing. Parents also lacked adequate transportation for themselves and the children, and they lacked natural supports in the community to ensure that the family's needs were met.

¶ 10. The court found that in her interactions with service providers and social workers, mother displayed scattered and unfocused thinking and communications regarding her needs and the children's needs. Neither parent was able to ensure that the children received the medical care, treatment, and support that they needed. Mother was unable to care for the children alone. Mother also regularly reported health problems with the children that were either grossly exaggerated or completely false, and sought unnecessary medical treatment for the children and herself for the imagined health problems that she reported. Mother displayed emotional detachment from the children that affected her ability to parent. Mother had great difficulty understanding and following through with recommendations and plans intended to help her cope with parenting the children. Additionally, mother functioned at the emotional and intellectual

4

level of a pre-teen. She had difficulty understanding day-to-day matters and had significant mood swings.

¶ 11. The court found that in the year following the disposition plan, neither parent had resolved the very significant issues identified by DCF and neither could resume caretaking responsibilities for the children. Father was unwilling or unable to take over responsibility for the children's medical care and appointments and ensure that recommendations and plans provided by DCF were implemented. As of the date of the TPR hearing, father continued to live with mother and had not developed the parenting and other skills needed to care for the children safely. It would be impossible, the court explained, for father to care for mother, protect the children, meet all of their needs, and support the family. Father was unemployed at the time of the hearing, although he was receiving some money for his work as a caretaker for mother. The parties received state benefits, which were barely sufficient to meet their financial needs.

¶ 12. The court reiterated that if father decided to live separately from mother, he did not possess the skills necessary to parent three young children. During their relationship, mother had been the children's primary caretaker and father was generally out of the house working. The children had been in the custody of a relative with a CCO since the disposition order. Father had some contact with the children since then, but his contact was not consistent, and his relationship and connection with the children was not strong. Father's inconsistent contact was due to a combination of his own failure to exercise his contact rights consistently and also to difficulties with the custodian's schedule that were outside his control. Nevertheless, the reality was that at the time of the TPR hearing, father had not acquired the skills or created the conditions under which he could successfully assume sole responsibility for the care of the children in a reasonable period of time. The court noted that father had not spent even one week with all three children on his own.

5

¶ 13. Based on these and other findings, including a finding that the children were well-adjusted to their current living situation, the court concluded that both parents had stagnated in their ability to parent and that termination of their rights was in the children's best interests. The court explained that the children had not had consistent contact with mother or father and they did not have a significant relationship with either parent. They had adjusted well and were settled in their new community. Neither parent could resume his or her parental duties within a reasonable period of time. Neither had played a constructive role in the children's lives, nor had they provided emotional support and affection that was so important for the children's emotional well-being. The court therefore terminated mother's rights in the three children without limitation to adoption, and terminated father's rights in O.B. and K.C. without limitation to adoption.

¶ 14. Two days after the court issued its decision, the State filed an emergency motion to transfer custody and guardianship to DCF. The State asserted that it had become necessary to remove the children from their current placement and indicated that the existing court orders left in question whether the children were now in DCF custody or in the conditional custody of Kristin Hall. The court's TPR order did not specify that custody and guardianship were now with DCF with regard to O.B. and K.C. Because the petition had requested the transfer of custody and guardianship to DCF and the petition was granted, however, DCF believed that custody and guardianship of OB and KC was now with DCF. Because only mother's rights to R.B. had been terminated, it was unclear whether custody and guardianship of R.B. rested with DCF or whether conditional custody of R.B. remained with Kristin Hall. DCF posited that custody and guardianship of all three children with DCF would enable it to address concerns that had arisen about the children's placement, particularly concerns that arose after the TPR hearing.

¶ 15. On November 14, 2014, the court issued an amended TPR order. It reiterated that parents' rights in the children were terminated without limitation as to adoption and explained

6

that the children were presently in the conditional custody of Kristin Hall. Given the court's decision regarding TPR, the court transferred custody and guardianship of O.B. and K.C. to DCF without limitation as to adoption. It also transferred temporary custody and guardianship of R.B. to DCF.

¶ 16. The children then moved for relief from judgment. They sought to remain in Ms. Hall's custody. Following a January 2015 hearing, the court vacated the order that had transferred custody of the children to DCF. It terminated DCF custody and returned all three children to the conditional custody of Ms. Hall.[4] The court found that DCF had not shown that the children were in danger in Ms. Hall's care or that removal from her custody was in their best interests. The children were well bonded to Ms. Hall and thrived in her care. Ms. Hall had a wide circle of supports.

¶ 17. The court found that there was a time when Ms. Hall declined to coordinate and supervise parent-child contact, which was a violation of the conditions of custody. She also failed to attend one or two team meetings. The court did not condone these violations. The better approach would have been to apply for modification of the CCO conditions. Nonetheless, the court found that the violations did not harm the children and parental rights were ultimately terminated. Importantly, the court found that no report of abusive conduct on Ms. Hall's part had been substantiated by DCF and no evidence presented from which the court could find that she caused the children harm. It ordered that the children remain in her conditional custody during the pendency of these proceedings absent further order of the court. The court then issued a revised conditional custody order. This appeal by mother and father followed.

---

[4] As the court recognized at the hearing, a conditional custody order that is issued following disposition "must be for a fixed period of time not to exceed two years." 33 V.S.A. § 5318(a)(2). The CCO to Ms. Hall was issued in August 2012 and more than two years elapsed between this date and the court's TPR decision.

¶ 18. We begin with parents' assertion that the order reinstating conditional custody in Kristen Hall was not authorized by statute. According to parents, because the court did not empower anyone to consent to an adoption, it did not provide the permanence that a true termination order would provide. Parents contend that the court essentially entered a new conditional custody order, rather than a termination order, and accordingly, it needed to address the issue of parent-child contact.

¶ 19. We reject these arguments. The only question presented with respect to parents is whether the court erred in terminating their residual parental rights. We have repeatedly held that termination of a parent's rights does not depend on the availability of a permanent placement option for the child. See, e.g., In re K.F., 2013 VT 39, ¶ 29, 194 Vt. 64, 72 A.3d 908 (explaining that in deciding whether to terminate father's rights, court was not required to make findings about potential placements for child; only issues before court at termination are whether there has been a substantial change in material circumstances and whether termination is in child's best interests, and court was not required to address possible alterative placements for child); In re T.T., 2005 VT 30, ¶ 7, 178 Vt. 496, 872 A.2d 334 (mem.) (recognizing that "an alternative placement is not a prerequisite to termination of parental rights"); In re S.B., 174 Vt. 427, 430, 800 A.2d 476, 481 (2002) (mem.) ("[W]e have repeatedly stated 'that a valid termination of parental rights does not depend on the availability of permanent foster care or adoption.' " (quoting In re D.M., 162 Vt. 33, 40, 641 A.2d 774, 778 (1994)); In re E.B., 158 Vt. 8, 15, 603 A.2d 373, 377 (1992) (termination of parental rights does not depend on alternative placement); In re L.A., 154 Vt. 147, 160, 574 A.2d 782, 789 (1990) (rejecting father's argument that court prematurely terminated his parental rights because no alternative permanent placement for the child existed at the time of the termination hearing, and explaining that court may terminate rights if it is in child's best interests, and best-interest analysis does not require availability of permanent placement); see also In re J.G., 2010 VT 61, ¶ 12 n.1, 188 Vt. 562, 2 A.3d 817 (mem.)

8

(questioning father's standing to challenge any post-termination custodial placement but addressing issue on merits as no party raised this issue and matter had been fully briefed). Any question about the children's placement has no bearing on whether the court erred in terminating parents' rights and it follows that parents have no standing to challenge the placement decision here.

¶ 20. As we have explained, a termination proceeding "is not a custody case" in which the family court must balance the respective advantages of different placement options, but rather "a legislatively created . . . proceeding in which the court is required to weigh specified statutory factors when determining whether to grant a petition for termination of residual parental rights." In re S.B., 174 Vt. at 430, 800 A.2d at 478. There is nothing in the statutory best-interests criteria that requires (or precludes) consideration of the particular permanency plan contemplated for the child, the need for or likelihood of adoption, or the suitability of prospective adoptive parents. The family court duly weighed the statutory best-interest factors here and determined by clear and convincing evidence that parents could not resume their parental rights and responsibilities within a reasonable time, and that the balance of factors compelled a termination of parental rights. The evidence in support of these conclusions is overwhelming and with one exception discussed below, unchallenged. We find nothing lacking in the court's analysis.

¶ 21. Even if parents could challenge the court's placement decision, the court acted within its authority in transferring custody to a relative after terminating parents' rights. We considered a similar issue in In re J.G., 2010 VT 61, ¶¶ 12-16, and found it appropriate for the court to have terminated a father's residual parental rights and transferred custody to the child's stepmother. The father in that case argued that the trial court could transfer custody only to DCF. DCF generally supported the father's position. The parties relied on 33 V.S.A.

9

§ 5318(a)(5), which provides a list of the types of orders a court may issue following a CHINS adjudication.

¶ 22. We were not persuaded that the statutory language or intent was as restrictive as the parties argued. Id. ¶ 13. Even assuming that the Legislature intended the court to use the options set forth in 33 V.S.A. § 5318 in post-disposition proceedings, we found nothing to suggest that this was an exclusive list. DCF conceded, moreover, that the statutory scheme was silent concerning the types of post-disposition orders the court could make. We found no reason that a court should be precluded from transferring legal custody to a relative, or other person with a significant relationship with the child upon termination of a parent's rights. Id. ¶ 14. The court's order in the instant case is consistent with our decision in In re J.G.

¶ 23. Parents recognize that under J.G., the trial court is granted broad authority in choosing a custodial option that is in a child's best interests. They argue, however, that unlike J.G., the court's order did not provide permanency for the children here because it did not order custody to Ms. Hall "without limitation as to adoption."

¶ 24. Our decision in J.G. did not turn on the fact that custody was awarded to stepmother "without limitation as to adoption," as parents suggest. Indeed, in J.G., we rejected DCF's argument that only a transfer of custody to DCF could promote permanency for a child and ensure that a child's adoption moved forward as planned. We explained that there might be cases where a TPR was granted as to one parent and custody awarded to the fit parent and the proceedings closed. There were other cases, like the award of custody to stepmother, where the statute expressly provided that the order transferring legal custody to a relative or another person with a significant relationship with the child "may be subject to conditions and limitations" and "shall be subject to periodic review as determined by the court." Id. ¶ 15 (citing 33 V.S.A. § 5318(a)(7)). We found that the statute provided ample authority in such cases for the court to ensure that the child's adoption moved forward as planned.

10

¶ 25. As in J.G., the court here determined that a placement with Ms. Hall was in the children's best interests. This placement was subject to conditions and presumably periodic review by the court. See 33 V.S.A. § 5318(a)(7). We note, moreover, that Ms. Hall testified at the TPR hearing that she wanted to adopt the children. In any event, the fact that adoption may not be imminent or may not even come to fruition does not mean that the court lacked authority to issue its order. As we have explained in rejecting a similar argument, "juvenile proceedings often involve difficult predictions about the future. Best judgment, rather than perfection, is our standard." In re T.T., 2005 VT 30, ¶ 7 (quotation omitted).

¶ 26. Parents next argue that the trial court failed to give them direct notice of a "third day" of the TPR hearing as required by In re M.T., 2006 VT 114, ¶ 10, 180 Vt. 643, 912 A.2d 456. Mother asserts that the original TPR order was not a final order because both DCF and the children moved to modify it within ten days of its filing. They maintain that the final order was the result of the original two-day TPR hearing and then the motion hearing on January 9, 2015. Thus, parents argue, the court erred when it failed to give them notice of the "third day" of the TPR hearing and an opportunity to be heard at that time.

¶ 27. We reject these arguments. The direct notice requirement set forth by this Court in In re M.T., 2006 VT 114, ¶ 10, applies only to termination-of-parental-rights hearings. The January hearing was a motion hearing. The record shows that the court completed a two-day termination hearing in April 2014 and issued its final TPR decision in November 2014. Following the judgment, DCF filed an emergency motion to transfer custody and guardianship to DCF; the children opposed this motion and requested a hearing. The children then filed a motion for relief from judgment and a motion to reconsider. Parents' attorneys were sent copies of all of these motions. The court sent notice of the January hearing date to mother's attorney but apparently not to father's attorney. Father's attorney had notice of the motions themselves, however, and constructive notice of the hearing date and time as he was copied on the State's

11

request to continue "the motion hearing now set for January 9, 2015 at 9:00 a.m." and the children's opposition to the State's request to continue the hearing "now set for January 9, 2015."

¶ 28. Even if the court erred in not providing notice to father's attorney, the error is harmless. In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108, 39 A.3d 682 (Supreme Court applies harmless error analysis in termination of parental rights cases, and will reverse judgment only where error has affected party's substantial rights). It is evident from the record that the only question at issue at the motion hearing was the children's placement. Parents contend that they were prejudiced because at the motion hearing, the court did not include a provision for parent-child contact in the new conditional custody order. They also suggest that the court's termination order was based on outdated information.

¶ 29. Putting aside that parents' attorneys could have attended the motion hearing and did not do so, we find these arguments without merit. Whatever right parents may have had to challenge the termination of their parental rights in a post-judgment motion, it does not extend to a right to challenge the children's post-termination placement. See In re L.A., 154 Vt. at 160, 574 A.2d at 789 ("Since visitation is a residual parental right, the termination of such rights necessarily eliminates the parent's right to visit the child."). Consistent with its termination decision, the court did not include a parent-child contact condition in the new CCO. Moreover, the basis for the children's post-judgment motion—that DCF had misrepresented to the court its intentions concerning post-termination permanency planning—evaporated when the court held a hearing and returned the children to Ms. Hall with the expectation that she would pursue adoption. We reject parents' assertion that they were entitled to present new evidence about their current situation at the motion hearing. Parents offer no support for this contention, and indeed, they identify no specific evidence that they would or could have presented at the motion hearing. We find no reversible error.

12

¶ 30. Finally, we turn to father's challenge to the merits of the court's decision. Father contends that his parental shortcomings were caused substantially by factors outside his control. Father states that, since the children were removed from the home, he came to understand mother's disease and took over as her custodian, and he understood that he must take over parental responsibilities. He indicates that he has housing that can accommodate the family. Father blames Ms. Hall for his failure to have any relationship with the children, maintain consistent contact with them, or play a constructive role in their lives. According to father, Ms. Hall caused him to be unable to make progress and move forward with parenting.

¶ 31. When the termination of parental rights is sought, the trial court must conduct a two-step analysis. In re B.W., 162 Vt. 287, 291, 648 A.2d 652, 654 (1994). The court must first find that there has been a substantial change in material circumstances; second, the court must find that termination of parental rights is in the child's best interests. Id. To determine the best interests of a child, the court must consider four statutory factors. 33 V.S.A. § 5114. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable period of time. See In re B.M., 165 Vt. 331, 336, 682 A.2d 477, 480 (1996). As long as the court applied the proper standard, we will not disturb its findings on appeal unless they are clearly erroneous; we will affirm its conclusions if they are supported by the findings. In re G.S., 153 Vt. 651, 652, 572 A.2d 1350, 1351 (1990) (mem.).

¶ 32. We find no error here. As set forth above, the court found that while the children were living with parents, they lived in deplorable and dangerous conditions. Parents did not provide them with needed medical care or adequate housing. Parents lacked adequate transportation, and they lacked natural supports in the community. Father was unwilling or unable to take responsibility for the children's medical care and appointments and ensure that the recommendations and plans provided by DCF were implemented. He was unable to devote the time necessary to provide adequate and safe housing.

¶ 33.    The court recognized that father was now acting as mother's caregiver and that he and mother lived in a two bedroom home.  The court concluded that it would be impossible for father to care for mother, protect the children, meet everyone's needs, including his own, and support the family.  Father could not care for the children on his own even if he chose to live apart from mother.  In reaching its decision, the court recognized that Ms. Hall had played some role in father's lack of contact with the children, but it found father responsible for the lack of contact as well.  Ms. Hall testified at the hearing that father frequently failed to contact the children as scheduled.  Father is responsible for his parental shortcomings and his failure to acquire the skills or create the circumstances that would allow him to parent the children.  While father might disagree with the court's conclusion, he has not shown any error.  See In re S.B., 174 Vt. at 429, 800 A.2d at 479 ("Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights.").

Affirmed.

FOR THE COURT:

_____
Chief Justice

¶ 34.    **DOOLEY, J., concurring.**  My vote to affirm depends upon an evaluation of the statutory scheme that demonstrates that the trial court order protects the children and allows a full range of permanency options.  Mother argues in her brief that the failure to award either the Department for Children and Families (DCF) or the conditional custodian residual parental rights or to provide that the transfer of custodial rights was "without limitation as to adoption" leaves no person or agency empowered to consent to adoption.  Mother argues that, as a result, there actually has been no termination of parental rights, only a new conditional custody order, and

14

there can be no adoption. The majority partially answers this argument but ultimately relies on our holdings that termination of parental rights can be ordered even if there is no permanency option immediately available to the child and that parents after termination of their parental rights have no standing to complain about disposition. I do not think the majority opinion fully answers the question presented.

¶ 35. Mother is correct that courts generally, upon termination of parental rights, transfer custody and residual parental rights to DCF "without limitation as to adoption." The terms "transferring . . . all residual parental rights" and "without limitation as to adoption" are found in the juvenile statutes. See 33 V.S.A. § 5318(a)(5) (stating that at disposition, court may enter order "terminating all rights and responsibilities of a parent by transferring legal custody and all residual parental rights to the Commissioner without limitation as to adoption"); see also id. § 5114 (stating that "any time a petition or request to terminate all residual parental rights of a parent without limitation as to adoption is filed by the Commissioner or the attorney for the child," court must evaluate statutory best-interest factors).

¶ 36. The court used part of this language with respect to R.B. in a February 2015 order once her father's rights were terminated, transferring custody of R.B. to Ms. Hall "without limitation as to adoption." The court also used this language in its first amended TPR order with respect to O.B. and K.C. It then granted the children's motion for relief from judgment, however, and struck this language. It placed the children in Ms. Hall's custody subject to conditions and directed that they remain in her custody "during the pendency of these proceedings absent further order of [the] court." The court did not place O.B. and K.C. in Ms. Hall's custody "without limitation as to adoption," and it did not expressly transfer parents' residual parental rights to Ms. Hall. The question for me is whether these omissions leave the children in some kind of limbo with no possibility of permanency and without a caretaker who can exercise the responsibilities of a parent.

15

¶ 37. The prospect of legal limbo was probably created in part because of the statutory language. Section 5318(a)(5) provides as a disposition alternative "[a]n order terminating all rights and responsibilities of a parent by transferring legal custody and all residual parental rights to the Commissioner without limitation as to adoption." Section 5318(a)(7) provides as another alternative "[a]n order transferring legal custody to a relative or another person with a significant relationship with the child. The order may be subject to conditions and limitations and may provide for parent-child contact with one or both parents." In essence, the drafting creates the argument that subdivision (5) provides the exclusive means of terminating parental rights and was not used here. That reading is reinforced by § 5318(b), which provides: "If the Court orders the transfer of custody pursuant to subdivision (a)(2), (4), or (5) of this section, the Court shall establish a permanency goal for the minor child and adopt a case plan prepared by the Department which is designed to achieve the permanency goal." Thus, the argument goes that the court in this case ultimately chose the (a)(7) disposition alternative, and that alternative is not intended to bring permanency to the child.

¶ 38. As the majority explains, our recent decision in In re J.G., 2010 VT 61, 188 Vt. 562, 2 A.3d 817, is against the above interpretation. This is because § 5318(a) begins the list of disposition alternatives with the following sentence: "At disposition, the Court shall make such orders related to legal custody for a child who has been found to be in need of care and supervision as the Court determines are in the best interest of the child . . . ." J.G. holds that, because the list in § 5318(a) is not exclusive, the court has the power to terminate parental rights and transfer custody and those rights to another a person with a significant relationship with the child, rather than to DCF, where the court finds such a disposition is in the best interest of the child. Id. ¶ 14. Mother argues that J.G. does not govern this case because, in that case, parental rights were explicitly transferred to the new caretaker, and here they were not.

16

¶ 39. Mother's argument leads me to a second point about § 5318(a)—it is about custody and only secondarily about termination of parental rights or its effect. Thus, we have to look elsewhere to determine the effect of a termination of parental rights and specifically whether a termination of residual parental rights, without a transfer of those rights to some person or entity, creates an unacceptable legal limbo or defeats permanency for the child.

¶ 40. The conditional custody order gives Ms. Hall "legal custody" of the children, subject to conditions, and requires that Ms. Hall allow the children's attorney and guardian ad litem to meet with the children at reasonable times and places with reasonable advance notice to the custodian. The term "legal custody" gives Ms. Hall the right to routine daily care and control over the children; the right to determine where and with whom the children will live; the authority to consent to major medical, psychiatric, and surgical treatment for the children; the responsibility to protect and supervise the children and provide the children with food, shelter, education, and ordinary medical care; and the authority to make decisions that concern the child and are of substantial legal significance, including the authority to consent to civil marriage and enlistment in the armed forces; and the authority to represent the children in legal actions. 33 V.S.A. § 5102(16)(A)(i)-(iv).

¶ 41. When Ms. Hall first obtained legal custody of the children, it was subject to parents' residual rights and responsibilities because termination of those rights had not occurred. Id. § 5102(16)(B). Those rights and responsibilities are the right to reasonable parent-child contact, the responsibility for support, and the right to consent to adoption. Id. § 5102(26). They have now been terminated. Putting aside the right to consent to adoption, discussed below, the termination of the right to contact and the responsibility for support do not create a legal limbo. The termination of the legal right to contact was done to protect the child. The termination of the responsibility of support is offset by the new support obligation of the legal custodian. The fact

17

that this right and this responsibility were not formally transferred to the legal custodian in this case is of no consequence.

¶ 42. Parents suggest that the critical parental right is the power to consent to the children's adoption, and that the TPR order therefore does not provide the permanence that a "true" termination would provide. This argument might be persuasive if our adoption law provided that either a parent—or DCF or a person to whom the parental right has been transferred—must consent to the adoption. In that circumstance, the failure to transfer residual parental rights to a person or DCF after termination of the parents' rights would mean that adoption is prohibited.

¶ 43. The law does not so provide. As parents acknowledge, their consent to the adoption is not required as their rights have been terminated. See 15A V.S.A. § 2-402(a)(2) (stating that "[c]onsent to an adoption of a minor is not required of: a person whose parental relationship to the minor has been judicially terminated or determined not to exist"). In fact, under the adoption law, they are no longer parents. See id. § 1-101(13). There is no requirement for consent by the person to whom residual parental rights have been transferred. In fact, the concept of transferring residual parental rights on termination is not reflected in the adoption statutes. The fact that there has been no transfer does not impact adoption rights.

¶ 44. Nor is there any significance under the adoption statute of the absence of the term "without limitation as to adoption" in the court's order transferring custody to a legal custodian.[5] The termination of parental rights alone accomplishes all that is needed under the adoption statute.

---

[5] The use of the language "without limitation as to adoption" with respect to DCF appears to be an authorization for DCF to place the child for adoption. 15A V.S.A. § 2-101(a)(4). The term "place for adoption" means "to select a prospective adoptive parent for a minor and transfer physical custody of the minor to the prospective adoptive parent." Id. § 1-101(15).

¶ 45. I recognize that the absence of need for parental consent also means that no person or entity may place a child for adoption if there is no guardian for the child and DCF is not authorized to place the child for adoption. Id. § 2-101(a). This might be seen as a legal limbo for the child, albeit because of the transfer of custody to the legal custodian and not the wording of such order. Although the legal custodian cannot place the child for adoption, a term that applies when another adoptive parent is selected, id. § 1-101(15), the legal custodian can petition to adopt the child if the custodian has physical custody for six months or more. Id. § 3-301(a)(2). That is the situation here.

¶ 46. My understanding of the statutes is consistent with the testimony presented at the January 9, 2015 motion hearing. The district director for the Barre DCF office testified that if parents' rights are terminated and the children are placed in the conditional custody of an individual, there would be no impediment to the children being adopted, subject only to the individual's ability to successfully be home studied by an adoption social worker. The director stated that it had been anticipated in this case that Ms. Hall would adopt the children and would maintain conditional custody during that process. The children's attorney similarly stated his belief that the plan throughout these proceedings was for Ms. Hall to adopt the children.

¶ 47. I recognize that my conclusion renders superfluous the transfer, or absence of transfer, of residual parental rights to a legal custodian or whether legal custody is ordered "without limitation as to adoption." These words appear in the juvenile law only when custody is transferred to DCF. I think the Legislature wanted to be clear about DCF's powers because the agency is a creature of statute and has only such powers as the statutes provide. Further, DCF's power to place a child for adoption with another depends upon it having been "expressly authorized to place the minor for adoption by a court order terminating the relationship between the minor and the minor's parent or guardian." Id. § 2-101(a)(4). Under the statutory scheme, similar power or authority statements are unnecessary with respect to a legal custodian who

19

desires to adopt the child. I urge trial judges not to make such statements when, following termination of parental rights, the court is transferring custody to a legal custodian and not to DCF.

¶ 48. I want to be clear that I am not stating that the legal custodian has an easy path to adoption, a distinctly different question. Irrespective of the position of DCF, the legal custodian in this case has standing to petition for adoption under 15A V.S.A. § 3-301(a)(2). In any event, the facts before the court were that DCF would support and aid the adoption by the legal custodian.

¶ 49. I am authorized to state that Justice Robinson joins in this concurrence.

_____
Associate Justice