NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 95

No. 2020-097

| | |
|---|---|
| In re A.M. & G.M., Juveniles | Supreme Court |
| | On Appeal from<br>Superior Court, Windham Unit,<br>Family Division |
| | July Term, 2020 |

Katherine A. Hayes, J.

Sarah Star of Sarah R. Star, P.C., Middlebury, for Appellant Father.

Michael Rose, St. Albans, for Appellant Mother.

Thomas J. Donovan, Jr., Attorney General, Montpelier, and Jody A. Racht, Assistant Attorney General, Waterbury, for Appellee Department for Children and Families.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **CARROLL, J.** Parents appeal from the termination of their rights in A.M. and G.M., ages five and four. They challenge the court's treatment of voluntary guardianship petitions filed during the pendency of the juvenile proceedings. Mother also argues that the court erred in terminating her rights. We affirm.

¶ 2. Parents struggle with substance abuse and have been incarcerated periodically during these proceedings. In January 2018, the Department for Children and Families (DCF) filed a petition alleging that the children were in need of care or supervision (CHINS) based on parental neglect, including squalid living conditions, and parental substance-abuse concerns. The children

were initially placed with their maternal grandmother pursuant to a conditional custody order (CCO), and then with mother pursuant to a CCO. In April 2018, with parents' agreement, custody of the children was transferred to DCF.

¶ 3. Parents stipulated that the children were CHINS, and following a June 2018 disposition hearing, the parties stipulated to continued DCF custody and to DCF's disposition case plan, which contemplated reunification by November 2018 or adoption. Parents were required to take various action steps to achieve reunification including actively engaging in substance abuse treatment and maintaining sobriety, submitting to random urinalysis, submitting to a mental health assessment and following treatment recommendations, signing releases to allow DCF to communicate with service providers, and maintaining a safe living environment for the children. The children did not see mother after June 2018 and they stopped seeing father before that time. As of September 2018, the children were placed together in the same foster home, where they remain.

¶ 4. Meanwhile, in July 2018, DCF moved to suspend parents' rights to parent-child contact (PCC), alleging that parents had relapsed and that they had been assaulted by third parties in their home and threatened with a gun. The court temporarily suspended PCC and parents then failed to attend a hearing on the suspension request. The court suspended parents' rights to PCC until they met with DCF and agreed to a safety plan, which would include ongoing substance abuse treatment and regular submission to urinalysis.

¶ 5. In August 2018, mother's sister and brother-in-law filed petitions in the probate division seeking voluntary guardianship of the children. After learning about the pending juvenile case, the probate division transferred the guardianship cases to the family division as required by law. See 14 V.S.A. § 2624(b)(1)(A) ("A custodial minor guardianship proceeding brought in the Probate Division under this article shall be transferred to the Family Division if there is an open

2

proceeding in the Family Division involving custody of the same child who is the subject of the guardianship proceeding in the Probate Division.").

¶ 6. The family and probate judges subsequently had a brief on-the-record conference regarding jurisdiction. See id. § 2624(b)(2)(A). Based on the conference, the minor guardianship cases were consolidated with the family division case in an October 2018 order. See id. § 2624(b)(2)(C)(ii). The petitioners in the guardianship cases were not given party status in the juvenile case but were given notice of future proceedings and allowed to attend those proceedings. The court stated that if it decided that a guardianship should be established, the guardianship cases would be transferred back to the probate division for ongoing monitoring.

¶ 7. In November 2018, DCF filed a petition to terminate parents' rights (TPR). At an April 2019 permanency planning hearing, the court discussed the guardianship petitions with the parties, who were represented by counsel, and the petitioners who were pro se. One of the petitioners was scheduled to testify at the termination hearing, which the court noted made her ongoing attendance at various juvenile hearings more complicated. The court explained that other courts in similar situations treated guardianship petitions as inactive during the TPR process with the plan that, if the TPR was denied, the guardianship petitions would be sent back to the probate division for a ruling. In that way, the proposed guardians would not need to continue attending juvenile hearings in which they basically had no role. Consistent with this approach, the court proposed issuing an entry order that revoked the consolidation order and, if there was still the potential for a guardianship after the termination hearing, sending the guardianship case back to the probate division.

¶ 8. The State agreed with this approach but father's attorney sought additional time to discuss the proposal with parents and the petitioners. Following the hearing, on May 1, 2019, the court issued an entry order as discussed. It emphasized that, if parents' rights were terminated, a transfer of the guardianship cases back to the probate division would be unnecessary as parents

3

would no longer have any right to agree to or oppose the guardianship requests. The court informed the parties that any objection to its order must be filed within two weeks. No one objected.

¶ 9. A termination hearing was held in August 2019. The court made numerous findings, including the following. At the time the CHINS case was filed, the children were living in a filthy home; the floors were black, there was mold and bags of garbage inside, and the children had severe and chronic headlice. Parents admitted to actively using heroin. Mother continued to struggle with substance use throughout these proceedings. She attended residential treatment and an intensive outpatient treatment program early in this case, but then relapsed twice. Not long thereafter, mother had a physical fight with a neighbor and admitted that she "probably" used a bat. Mother then overdosed on drugs and was briefly hospitalized. She testified that she had been using drugs since high school, or around seventeen years. Mother did not comply with repeated requests to obtain drug testing. She was discharged unsuccessfully from an intensive outpatient program due to noncompliance. She did not follow through with recommended mental health treatment. She missed numerous visits with the children. Mother's ability to care for the children and her health steadily declined. During this time, father had little to no involvement with the children and he did not engage with DCF. He did not make progress on the action steps required of him. He was arrested and charged with burglary.

¶ 10. As indicated, the court explained that parents' PCC was temporarily suspended in July 2018 after they were attacked in their home in a drug-related incident. Parents did not appear at a hearing on the motion. By August 2018, parents had essentially dropped out of sight. They did not seek any PCC. Several months later, mother contacted the DCF caseworker and informed her she was living in a new location. The caseworker approved parents sending letters to the children and parents sent one Christmas card.

4

¶ 11.   Parents were charged with numerous crimes during these proceedings and both were incarcerated.  Mother was on furlough status at the time of the termination hearing; father remained incarcerated.  At the time of the hearing, mother was living with father's grandmother, who welcomed mother and the children living with her.  The court noted that mother had an upcoming surgery and would need time to recover afterward.  One of the petitioners in the guardianship action also testified.  She expressed her belief that mother was now capable of caring for the children.  Mother testified that she had been sober for nearly a year at the time of the hearing and that she was committed to maintaining sobriety.  She denied that her drug use had affected the children while they were living with her, that they had been exposed to her drug use, or that dangerous people were even in the home while the children were with her.  Mother did not provide the records from her ongoing substance abuse treatment or her urinalysis results at the hearing.  There was confusion about whether she had provided the necessary releases to enable DCF to obtain these records.  As to the children, the court found that they were doing well in their foster home, where they had been since September 2018.  The foster parents wanted to adopt the children.

¶ 12.   Based on these and numerous other findings, the court concluded that parents had stagnated in their ability to parent the children and that termination of their rights was in the children's best interests.  With respect to stagnation, it found that parents failed to make progress toward significant and necessary goals.  Most importantly, they failed to: promptly engage in substance abuse and mental health treatment; cooperate with DCF and provide samples for urinalysis when requested; provide a safe living environment for the children that was free of substance abuse, violence, and danger; and demonstrate an ability to care for the children and meet their needs.  They also failed to have an active, healthy relationship with the children.  It recounted the history of this case in detail, including: father's disengagement with the case plan and the children; mother's failure to obtain substance abuse treatment sufficient to allow her to meet the

children's needs; her failure to communicate with DCF or consistently attend the visits with the children that were offered; and both parents' criminal conduct and incarceration.

¶ 13. Turning to the statutory best-interest factors, the court concluded that each factor supported termination. As to the most important factor, it concluded that neither parent could resume parenting the children within a reasonable time. Among other things, it found that father had no significant relationship with the children and that it was uncertain when and under what conditions he might be released from jail. As to mother, the court found that she was in very early recovery and she had not seen the children for well over a year by the time of the termination hearing. She had not followed through in writing to the children regularly. She had serious health issues that required surgery with a recovery time of several weeks. While mother loved the children, she was, from the children's perspective, almost a stranger to them given their ages and the long lapse in contact. The court also found that both parents were under sentences that put them at risk of reincarceration if they relapsed or otherwise violated their supervision requirements. If parents were reincarcerated, the children would again be without proper parental care and they would be retraumatized. The court found this to be a significant risk for both parents given the seriousness of their underlying convictions and the length of their underlying sentences. For these and other reasons, it concluded that termination of parents' rights was in the children's best interests. Both parents appealed.

¶ 14. Father challenges the court's treatment of the guardianship petitions. He argues that the court had only two options in how to address the guardianship petitions: either return them to the probate division at the outset or decide them on the merits as part of the juvenile proceedings. Father contends that by deciding the TPR without ruling on the guardianship petitions, the court acted outside its authority. According to father, the court unfairly prioritized the disposition proposed by the State rather than considering all disposition possibilities, resulting in a "structural constitutional error," and an order that was not in the children's best interests. Father asserts that

6

he has standing to raise these arguments because of his "legally cognizable interest in his continued relationship with the children." Father also raises various arguments on behalf of petitioners. Mother joins in father's arguments and raises other arguments concerning the merits of the termination decision discussed below.

¶ 15. We find no error, let alone structural error, assuming that doctrine applies here. See State v. Muscari, 174 Vt. 101, 116-17, 807 A.2d 407, 419 (2002) ("[S]tructural error involves a defect that affected the framework in which the trial proceeded, and thus, prevented the trial from serving its function as a vehicle for determining the guilt or innocence of the defendant." (quotation omitted)); see also State v. Kandzior, 2020 VT 37, ¶ 30, __ Vt. __, __ A.3d __ (explaining that "[s]tructural error is distinguished from mere 'trial error,' which is error that 'occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless' " (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)). The court acted within its authority and within its discretion in its treatment of the guardianship petitions.

¶ 16. At the outset, we emphasize that father did not request permanent guardianship as a disposition option at the time of the TPR hearing. Instead, mother urged the court to deny the TPR and return custody of the children to mother with the expectation that father would join the family unit after being released from jail. Father therefore failed to "preserve[] for appeal a challenge to the trial court's failure to consider a disposition of permanent guardianship" with his sister-in-law and brother-in-law. In re C.B., 2020 VT 80, ¶ 35, __ Vt. __, __ A.3d __ (reaching similar conclusion).

¶ 17. We thus turn to the court's treatment of the petitions for voluntary guardianship. We recently addressed the laws governing how petitions for guardianships of minor children should be treated when there are pending custody proceedings in the family division at the time the petitions are filed. See id. ¶¶ 11-28. By statute, a guardianship petition must "be transferred

7

to the Family Division if there is an open proceeding in the Family Division involving custody of the same child who is the subject of the guardianship proceeding in the Probate Division." 14 V.S.A. § 2624(b)(1)(A). When the matter is transferred, the Probate Division and Family Division "must confer on the record." In re C.B., 2020 VT 80, ¶ 16 (citing 14 V.S.A. § 2624(b)(2)(A)). The Family Division may then "consolidate the minor guardianship case" with the pending juvenile case and "determine whether a guardianship should be established" or it may "transfer the guardianship petition back to the Probate Division for further proceedings after the pending matter in the Family Division has been adjudicated." 14 V.S.A. § 2624(b)(2)(C).

¶ 18. We emphasized in C.B. that "the family division has a broad range of options as to timing and outcome when a minor guardianship proceeding is transferred to [it] under 14 V.S.A. § 2624," and it "has the discretion to determine whether and when to address the minor guardianship petition relative to the CHINS petition." 2020 VT 80, ¶ 22. If it chooses to consolidate the matters, it "may prioritize the CHINS proceeding and subsequently transfer the minor guardianship proceeding back to the probate division pursuant to § 2624(b)(2)(C)(ii)— either before or after finally resolving the CHINS case." Id. "Whatever resolution, the court's decision must be internally consistent and be supported by sufficient evidence and reasoning" and the court "has discretion to choose the path most likely to promote each child's best interests." Id. We recognized that "as circumstances change through the course of a case, on its own initiative or in response to arguments by parties, the court's approach to the alternative paths may shift." Id. ¶ 27.

¶ 19. The family division's actions here were consistent with the law and with our decision in C.B. As set forth above, juvenile proceedings began in this case in January 2018. Seven months later, in August 2018, petitions for voluntary guardianship were filed in the probate division. The family division conferred with the probate division and took jurisdiction over the

8

guardianship petitions in October 2018. See 14 V.S.A. § 2624(b)(2)(A), 2624(b)(2)(C)(ii). The following month, DCF moved to terminate parents' rights.

¶ 20. Once the guardianship petition was transferred to the Family Division as required by law, the Family Division had discretion in determining how to proceed. See id. § 2624(b)(2)(C) (outlining options court "may" choose, including returning guardianship to Probate Division for further proceedings following adjudication of Family Division matter). It exercised its discretion based on the particular circumstances of this case. While it initially consolidated the matters, it reconsidered that decision following a status conference at which the parties and the proposed guardians had the opportunity to weigh in. See In re C.B., 2020 VT 80, ¶ 27 (recognizing that "as circumstances change through the course of a case, on its own initiative or in response to arguments by parties, the court's approach to the alternative paths may shift"). It decided, without objection, that it would address the TPR petition prior to entertaining the guardianship petitions. It informed the parties that "if parents' rights are terminated, a transfer of the guardianship cases back to the probate division will not be needed, as the parents will no longer have any right to agree or oppose any guardianship." It sought out objections to this approach and received none.

¶ 21. Putting aside father's failure to object, the court provided a reasoned basis for its decision. See In re L.R.R., 143 Vt. 560, 562, 469 A.2d 1173, 1175 (1983) ("[T]his Court, on appeal, will not set aside a discretionary ruling if there is a reasonable basis for the lower court's action."). It explained that the filing of the TPRs for the children had changed the calculus and that it now made little sense for the petitioners to continue to attend hearings at which they had no role; the court also expressed concern about the petitioners' continued presence at the hearings when they would be testifying as witnesses in the upcoming TPR. It chose a course expressly recognized in C.B. It "prioritize[d] the CHINS proceeding and subsequently transfer[red] the minor guardianship proceeding[s] back to the probate division . . . after finally resolving the CHINS case." In re C.B., 2020 VT 80, ¶ 22.

9

¶ 22.     Parents offered no objection to the court's clear statement that it would first decide the TPR, which could affect the viability of the voluntary guardianship requests. Cf. id. ¶ 28. Parents' suggestion that they ostensibly became pro se with respect to the guardianship case and that they were "in no position to understand or object to the [court's] procedure" is frivolous. Parents were represented by, and consulted with, counsel during these proceedings, including with regard to the court's decision on when it would address the guardianship petitions. Putting aside their failure to object, parents fail to demonstrate any abuse of discretion in the court's treatment of the guardianship petition.

¶ 23.     Parents lack standing to make claims on behalf of the petitioners. See In re R.B., 2015 VT 100, ¶ 19, 200 Vt. 45, 126 A.3d 496 (explaining that "[t]he only question presented with respect to parents is whether the court erred in terminating their residual parental rights" and because "[a]ny question about the children's placement has no bearing on whether the court erred in terminating parents' rights," "it follows that parents have no standing to challenge the placement decision"). We thus do not address their assertions that petitioners may not have had notice about the court's ruling on their guardianship petition or that they may not have known that parents' rights were terminated. We similarly do not address their assertion that petitioners were treated unfairly as pro se litigants or their contention that the court erred in stating that there would be no need to transfer the guardianship petition back to the Probate Division if parents' rights were terminated.

¶ 24.     We turn next to mother's challenges to the merits of the court's termination decision. Mother argues that the court's stagnation conclusion was flawed because: it made contradictory findings about her prompt engagement in substance abuse treatment; her relapses were not per se evidence of stagnation; there was confusion over whether she had signed releases allowing DCF to obtain her treatment records; and DCF did not seek urinalysis samples from her after she was released from jail in May 2019. She argues that she has made substantial progress

10

in addressing her substance abuse issues. Mother also contends that DCF is responsible for her lack of contact with the children. Finally, mother asserts that the court's finding about her upcoming surgery and its recovery time were irrelevant to an analysis of the children's best interests.

¶ 25. We find these arguments without merit. As we have often explained, when the termination of parental rights is sought after initial disposition, the trial court must first find that there has been a substantial change in material circumstances, and second, that termination of parental rights is in the child's best interests. 33 V.S.A. §§ 5113, 5114; In re B.W., 162 Vt. 287, 291, 648 A.2d 652, 654 (1994). A substantial change in material circumstances is most often found when "the parent's ability to care properly for the child has either stagnated or deteriorated over the passage of time." In re B.W., 162 Vt. at 291, 648 A.2d at 654-55 (quotation omitted). To determine the best interests of a child, the court must consider four statutory factors. See 33 V.S.A. § 5114. The most important factor is the likelihood that the natural parent will be able to resume his or her parental duties within a reasonable time. See In re B.M., 165 Vt. 331, 336, 682 A.2d 477, 480 (1996). "As long as the court applied the proper standard, we will not disturb its findings unless they are clearly erroneous, and we will affirm its conclusions if they are supported by the findings." In re G.S., 153 Vt. 651, 652, 572 A.2d 1350, 1351 (1990) (mem.). "Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating mother's parental rights." In re S.B., 174 Vt. 427, 429, 800 A.2d 476, 479 (2002) (mem.).

¶ 26. Mother suggests that the court's findings regarding her substance abuse treatment are inherently contradictory because it found that parents failed to promptly engage in substance abuse treatment but it also recognized that mother did engage in treatment early on in these proceedings. Any misstatement by the court in this regard is harmless. The court's statement is true as to father and while mother did engage in treatment early in these proceedings, she almost

11

immediately suffered several relapses and also suffered an overdose that required her hospitalization. The court made specific findings regarding mother's progress that are supported by the record and, taken in the context of the decision of a whole, its statement that mother failed "to promptly engage in substance abuse and mental health treatment" was harmless error. Mother's relapses were certainly relevant to the court's evaluation of stagnation. Her drug use was one of the reasons the children were declared CHINS and her ability to maintain sobriety was a key component of her case plan.

¶ 27. The court similarly did not err in finding that mother failed to ensure that information about her substance abuse treatment was made available to DCF and to the court. Its recognition that there had been confusion over whether mother signed releases does not undermine this finding. The court's statement about mother's failure to provide urinalysis samples was not limited to a specific timeframe, as mother appears to suggest. Mother's assertion that she is no longer in the "very early recovery" stage of her drug addiction is simply a challenge to the trial court's assessment of the evidence. Mother admitted to long-term drug use and she had been out of jail for only three months at the time of the termination hearing. The court did not commit clear error in characterizing her recovery as in its early stages.

¶ 28. Mother's contention that DCF is to blame for her lack of parent-child contact is equally without merit. Mother missed many visits that were offered to her. She did not attend a hearing on the suspension of her PCC nor did she take the steps necessary for PCC to resume. Mother did not avail herself of the type of contact that was offered once she resumed contact with her DCF caseworker. Whether letter writing was a precursor to in-person contact is immaterial. Mother, not DCF, is responsible for her failure to engage in PCC. Finally, the court did not err in its findings about mother's upcoming surgery and her recovery time. Mother introduced this evidence at the hearing and it arguably had some bearing on mother's availability to parent the children. Even if it were not relevant, the error was harmless. The court's decision did not turn

on this finding. Instead, the court focused on mother's lack of relationship with the children, the children's young ages, the fact that mother was in the very early recovery stage in addressing her longstanding substance abuse issues, and her significant risk of reincarceration. The court's findings on these points is supported by the record. The court did not err in terminating parents' rights.

Affirmed.

FOR THE COURT:

_____
Associate Justice