VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      25-AP-104

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant.  Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

AUGUST TERM,   2025

| | |
|---|---|
| In re E.M., Juvenile<br>(C.M., Father\*) | } APPEALED FROM:<br>}<br>} Superior Court, Rutland Unit,<br>} Family Division<br>} CASE NO. 23-JV-01433<br>Trial Judge: John W. Valente |

In the above-entitled cause, the Clerk will enter:

Father appeals a family court order terminating his parental rights in son E.M.  We affirm.

### I.  Factual and Procedural Background[1]

E.M. was born in August 2023.  On October 3, 2023—when he was just over a month old—the State filed a petition seeking a determination that E.M. was a child in need of care or supervision (CHINS) because he was "without proper parental care or subsistence, education, medical, or other care necessary for his . . . well-being."   33 V.S.A. § 5102(3)(B).   The supporting affidavit alleged that E.M. was at risk of harm as a result of father's abusive and controlling behavior toward mother.  Later that day, the family court placed E.M. in the custody of the Department for Children and Families (DCF) under an emergency-care order.

After the emergency-care order was issued, father sent numerous texts to the DCF caseworker.  The caseworker reasonably interpreted several of these messages as threats.  As a result of father's conduct, the case was transferred to a different DCF district office and assigned to a new caseworker.

A temporary-care hearing was held on October 16, 2023.  Based on the evidence presented, the court concluded that it was in E.M.'s best interests to be returned to mother and father under a conditional custody order (CCO).  The CCO was issued on October 26, 2023.  DCF accordingly attempted to contact the parents to return E.M. to their care.  Father responded

---

[1]  The following background is derived from the record and the factual findings in the trial court's termination order, which father does not challenge on appeal.  Mother's rights in E.M. were also terminated; because she did not appeal, we focus here on the factual and procedural background relevant to father.

with a text message saying, "Stop calling me I don't care I'm not even in Vermont anymore." When asked if he had received an earlier message explaining that DCF was attempting to arrange to return E.M. to parents' custody, father responded, "I don't care. I'm literally in Canada living my best life. I don't need the bullshit of conditions stop calling and texting." Mother also messaged DCF to express her unwillingness to resume caring for E.M.

As a result, the State filed a second CHINS petition on October 26—this time on grounds of parental abandonment. 33 V.S.A. § 5102(3)(A) (providing that child is CHINS if "abandoned . . . by the child's parent, guardian, or custodian"). The court vacated its CCO and, in the second case, placed E.M. in DCF custody under emergency- and temporary-care orders. The first CHINS case was later dismissed by the State and the matter proceeded in the docket below.

Although DCF continued to reach out to parents, they rarely responded. At the end of November 2023, parents informed DCF that they wished to reunify with E.M. but did not want any conditions placed on that reunification.

In the beginning of January 2024, father sent the DCF caseworker approximately 142 texts over the course of two hours. These messages included threats toward others and indications that father was surveilling E.M.'s foster parents, and they reasonably placed the caseworker in fear of physical harm. The State moved for a juvenile protective order prohibiting father from, among other things, discovering the names, locations, or contact information of E.M.'s foster family and providing that he could have contact with E.M. only in compliance with a parent-child contact order issued by the court. See 33 V.S.A. § 5115(a) ("On motion of a party . . . the court may make an order restraining or otherwise controlling the conduct of a person if the court finds that such conduct is or may be detrimental or harmful to a child."). The court issued a temporary protective order and set the matter for a hearing later the same month. At that hearing, father indicated that he did not object to the issuance of a protective order with findings waived by the parties. The court accordingly issued the protective order including the terms requested by the State.

A hearing on the merits of the State's second CHINS petition was held in April 2024.[2] Prior to the hearing, the DCF caseworker attempted to locate and speak with both parents, including by calling various hotels. The day before the hearing, the caseworker received a call from mother. In the background, father could be heard saying "I am going to punch her in the face." His tone was more escalated than it had been in previous communications, and the caseworker became frightened that father would act on his threats.

In May 2024, the State charged father with two misdemeanor counts of threatening a public servant based on his communications with the caseworker in January and April 2024. That same day, father assaulted a law-enforcement officer, gained control of the officer's handcuffs, handcuffed the officer, and then assaulted him again as he lay restrained on the ground. Father was subsequently charged with four felonies: aggravated assault on a law-enforcement officer resulting in serious bodily injury; first-degree unlawful restraint exposing a person to risk of serious bodily injury; aggravated assault on a law-enforcement officer to prevent performance of a lawful duty; and impeding a public officer. He was incarcerated pending trial.

---

[2] The merits hearing was originally scheduled for December 2023, but was reset after the court granted father's attorney's motion for leave to withdraw and appointed new counsel.

The court issued its merits order in June 2024, concluding that E.M. had been abandoned by his parents at the time of the second petition and was therefore CHINS. Father later sent the caseworker a letter that did not provide any information on father's current status or willingness to work with DCF and did not express a desire to parent E.M.

In August 2024, the court issued a disposition order adopting a case plan with a goal of reunification with one or both parents by October 2024. This goal date was chosen because it would mark one year in DCF custody for E.M. The case plan included the following action steps for father: meeting with DCF as requested and maintaining open and honest communication with the agency; participating in mental-health and substance-use assessments and following any resulting treatment recommendations; completing a domestic-violence accountability program intake and, if admitted, successfully completing the program; and maintaining stable housing.

By the end of September 2024, parents had made little progress on their action steps. At this time, mother told DCF that she did not want to parent E.M. Father remained incarcerated. The State then filed a petition to terminate parents' rights. DCF also moved for a determination of reasonable efforts.

The court held a hearing on the State's petition and DCF's motion in March 2025. It heard testimony from father and the DCF worker assigned to the case and admitted several exhibits filed by the State. The court's findings of fact included the following.

Father loved E.M. However, father had not seen E.M. since he was placed in DCF custody at the beginning of October 2023. DCF took steps to initiate supervised visits between father and E.M., but when father called the organization that was to supervise his parent-child contact, the discussion became contentious. After learning of father's criminal charges, the organization informed DCF that it was required to refuse the case because it could not reasonably ensure the safety of those involved with the visits. Any further options for parent-child contact were limited by father's incarceration.

Father made little verified progress on his action steps. There was no evidence that he completed a substance-use evaluation, engaged in mental-health treatment, or participated in any domestic-violence accountability program.

At the time of the termination hearing, father was still incarcerated and awaiting trial. Although he believed his pending charges would soon be dismissed, the court found this speculative. Father was aware that mother had indicated she did not wish to parent E.M., but described mother as "a whiner" and opined that she would care for E.M. if ordered to do so by the court. The court found this opinion inconsistent with the evidence. Father also believed that if E.M. was brought to visit him at the correctional facility, he could resume parenting E.M. within one-and-a-half to two years. It was unknown where father could live if released.

E.M. had been living with his foster family since he first entered DCF custody at just over a month old. He was well-adjusted to their home, and they ensured that his needs were met.

The court determined that DCF had engaged in reasonable efforts to achieve reunification. It also concluded that there had been a change in circumstances sufficient to consider modifying its disposition order and, after weighing the statutory criteria, concluded that it was in E.M.'s best interests that both parents' rights be terminated. It therefore issued a termination order. This appeal followed.

## II. Discussion

When the State moves to terminate parental rights after disposition, the family court undertakes a two-step analysis. In re D.S., 2016 VT 130, ¶ 6, 204 Vt. 44; 33 V.S.A. §§ 5113(b), 5114(a). It must first determine whether "a change in circumstances requires such action to serve the best interests of the child." 33 V.S.A. § 5113(b). Where this threshold is met, the court goes on to consider whether termination is in the child's best interests under the statutory criteria set forth at 33 V.S.A. § 5114(a). "The decision to terminate parental rights is committed to the discretion of the family court." In re D.M., 162 Vt. 33, 38 (1994). Provided the court applied the proper standard, we will not disturb its findings unless clearly erroneous and will affirm its conclusions if supported by those findings. In re N.L., 2019 VT 10, ¶ 9, 209 Vt. 450.

On appeal, father challenges the second step in the trial court's analysis: its consideration of the § 5114(a) factors and subsequent conclusion that the termination of father's parental rights was in E.M.'s best interests.[3] He argues that in light of E.M.'s young age and father's prediction that he could resume parenting within two years, termination was not in EM.'s best interests.[4]

---

[3] Though father does not argue that the trial court erred in determining that there had been a change in circumstances, we take this opportunity to note that—while any error was harmless—it is not entirely clear that the court correctly framed the first step of its analysis. On this point, the family division explained that the § 5113(b) threshold was met because the State: (1) had proven there was a change in circumstances and father had not "demonstrated the improvement contemplated in the time contemplated"; and (2) demonstrated stagnation through "evidence that with the passage of time, there ha[d] been no improvement in [father's] parental capacity." To the extent the court thus suggested that the § 5113(b) inquiry proceeds in two steps, this articulation of the test is not supported by our case law. While each of the considerations identified by the court may be relevant, they are not independent questions, but instead related concepts often linked under the circumstances of a given case. We have recognized that there are multiple ways to show changed circumstances, although this threshold "is most often met by showing stagnation in a parent's ability to care for a child." In re D.C., 2012 VT 108, ¶ 18, 193 Vt. 101. In turn, "[s]tagnation may be shown by the passage of time with no improvement in parental capacity to care properly for the child," In re B.W., 162 Vt. 287, 291 (1994) (quotation omitted), or "found when the parent has not made the progress expected in the plan of services . . . despite the passage of time," In re D.S., 2016 VT 130, ¶ 6, 204 Vt. 44. While we therefore take this opportunity to clarify that § 5113(b) does not call for a multifactorial analysis, we note that any error in the structure of the court's reasoning was harmless because its findings that father had not improved his parenting abilities over time or made the progress expected in the case plan both supported its determination that father had stagnated, which in turn demonstrated changed circumstances. In re R.W., 2011 VT 124, ¶ 17, 191 Vt. 108 (explaining that we apply harmless-error standard in termination cases whereunder "error warrants reversal only if a substantial right of the party is affected" (quotation omitted)).

[4] Father also asserts that DCF failed to exercise reasonable efforts because it did not arrange for E.M. to have visits with him at the correctional facility and suggests that the court therefore erred in terminating his parental rights. As we have repeatedly recognized, "whether DCF made reasonable efforts to achieve permanency is a separate question from whether termination is in the child's best interests and the former is not a prerequisite to the latter." In re C.P., 2012 VT 100, ¶ 38, 193 Vt. 29. This argument is therefore without merit.

The four factors set forth at § 5114(a) are: (1) the child's interaction with parents, siblings, foster parents, and any other significant person; (2) the child's adjustment to home, school, and community; (3) the likelihood that the parent will be able to resume parental duties within a reasonable time; and (4) whether the parent has played and continues to play a constructive role in the child's welfare. "The most important factor is whether the parent will be able to resume parenting duties within a reasonable period." In re C.P., 2012 VT 100, ¶ 30, 193 Vt. 29. "The reasonableness of the time period is measured from the perspective of the child's needs, and may take account of the child's young age." Id. (citation omitted).

The trial court appropriately considered each of these factors. Its reasoning included the following. Father had no current relationship with E.M. and did not play a constructive role in his life. Father's prospective ability to parent was limited by his admission that he would be ready to resume parenting in one-and-a-half to two years, his current incarceration and potential sentence, and his lack of progress on his action steps. Although father blamed others for his failure to engage with the case plan, he failed to respond to many of DCF's attempts to contact him and, when he did respond, the contact was not constructive. Father could not resume parenting within a reasonable period from E.M.'s perspective. On the other hand, E.M. was well-adjusted to his foster family and had lived with them for most of his life.

"Our role is not to second-guess the family court or to reweigh the evidence, but rather to determine whether the court abused its discretion in terminating [father's] parental rights." In re S.B., 174 Vt. 427, 429 (2002) (mem.). Father's disagreements with the court's reasoning do not demonstrate an abuse of discretion. In re R.B., 2015 VT 100, ¶ 33, 200 Vt. 45; see Meyncke v. Meyncke, 2009 VT 84, ¶ 15, 186 Vt. 571 (explaining that arguments "amount[ing] to nothing more than a disagreement with the court's reasoning and conclusion . . . do not make out a case for an abuse of discretion"). As a result, father has not identified any basis to disturb the family division's decision.

Affirmed.

BY THE COURT:

Paul L. Reiber, Chief Justice

Harold E. Eaton, Jr., Associate Justice

Nancy J. Waples, Associate Justice